**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ENTERPRISE ASSOCIATION OF STEAM, HOT WATER, HYDRAULIC, SPRINKLER, PNEUMATIC TUBE, ICE MACHINE AND GENERAL PIPE-FITTERS OF NEW YORK AND VICINITY, LOCAL UNION NO. 638, OF THE UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA, and Michael F. Daly, Its Agent, Respondents.**

**No. 43, Docket 26186.**

United States Court of Appeals
Second Circuit.

Argued Oct. 6, 1960.

Decided Nov. 25, 1960.

On Petition for Rehearing

Jan. 30, 1961.

Melvin J. Welles, Atty., National Labor Relations Board, Washington, D. C.

(Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Robert Sewell, Atty., National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

John A. McAvinue, Jr., New York City (Peter Kaiser, New York City, on the brief), for respondents.

Before HINCKS, WATERMAN and MOORE, Circuit Judges.

HINCKS, Circuit Judge.

Consolidated Edison Company [Edison] awarded the general piping contract for the "Arthur Kill Generating Station," a turbine generating plant on Staten Island, to Courter & Co., Inc. [Courter]. Under this contract, Courter was obliged to fabricate and install such piping as Edison should provide for the Arthur Kill project. Among the conditions to which this contract was subject was that Edison "without invalidating the Contract, may by due notice in writing to the Contractor [Courter] * * * make changes by * * * deducting from the work."

Courter, through its membership in the Mechanical Contractors of New York, Inc., has a collective bargaining agreement with the respondent Union, of which Courter's employees are members. One provision of this agreement forbids, in effect, the subcontracting of pipe fabrication: "Acetylene, electric or other forms of cutting or welding shall be done either in the shop or on the job of the direct employer at the option of the employer." In March, 1958, Courter subcontracted the fabrication of certain piping systems to Asco Supply Co. [Asco]. Acting under instructions from the respondent Daly, business agent of the respondent Union, Courter's employees unloaded the Asco pipe but refused to install it. As a result, Courter fell behind on its schedule. After some dispute between Courter and Daly,[1] Daly agreed to

---

1. The Union claimed that the subcontracting to Asco violated the collective agreement. Courter maintained that it was customary to waive strict compliance with the provision when the job demanded it. The Board did not find the re-

**644**

the installation of the Asco pipe already delivered, but made no commitment on the remainder of the Asco order.

By late June, Courter informed Edison that he could not get assurances from the respondents on the balance of the Asco pipe and that it therefore could not keep up with schedule. Edison, under the power given it by the contract, thereupon instructed Courter to determine which piping systems were furthest behind and that it could withdraw those from the contract. This was done; some eight such systems were withdrawn.

Edison then awarded to Midwest Piping Co. [Midwest] a contract for the fabrication of the withdrawn systems. Edison neither consulted with Courter nor advised it of the granting of the contract.

At the instructions of the respondent Union through the respondent Daly, Courter's employees refused to install the Midwest pipe, but merely unloaded it and placed it in a storage area. The Labor Board has found this action by respondents to be a violation of then section 8 (b)(4)(A) of the National Labor Relations Act, as amended,[2] on the ground that the respondents concededly had induced Courter's employees to refuse to handle Midwest's pipe with an object of forcing or requiring Edison to cease doing business with Midwest and of forcing or requiring Midwest to cease doing business with Edison.

■ Respondents resist this order on three grounds which may best be dis-posed of in reverse order. Respondents argue that Courter's employees had no obligation to install Midwest pipe in the absence of a contract between the respondent Union and Midwest or Edison. As to this, we agree with the finding of the Board's Trial Examiner, which was adopted by the Board, that "the erection and installation of the pipe in question remained Courter's obligation under its contract with Edison, notwithstanding the removal therefrom of the fabrication of the eight systems. Since respondent Local 638 had a contract with Courter requiring the performance of such services and Courter actually ordered the services whose refusal respondents induced, the lack of a contract between Edison and Local 638, or between Midwest and Local 638, is obviously immaterial."

Respondents also argue that "Edison and Midwest, in cooperating with Courter by taking and doing work which belonged to Courter's employees, cannot be protected by Section 8(b)(4)(A)." By this argument they invoke the "ally" doctrine of which the facet here pertinent originated with Judge Rifkind's opinion in the Ebasco case, Douds v. Metropolitan Federation of Architects, etc., Local 231, D.C.S.D.N.Y., 75 F.Supp. 672. That decision was specifically approved by us in the Royal Typewriter case, N. L. R. B. v. Business Machine & Office Appliance Mechanics, Local 459, 2 Cir., 228 F.2d 553, certiorari denied 251 U.S. 962, 76 S. Ct. 1025, 100 L.Ed. 1483, and is well-supported by the Act's legislative history, see 95 Cong. Rec. 8709 (remarks of the

spondents guilty of an unfair labor practice in causing Courter's employees to refuse to install the Asco pipe, and the "Asco pipe incident" itself is not before us.

2. Section 8(b) (4) was amended in 1959, and the provision applicable here was renumbered as section 8(b) (4) (B), 29 U.S.C.A. § 158(b) (4) (B). In pertinent part, section 8(b) (4) provides, in its present form, that it shall be an unfair labor practice for a labor organization or its agents:

"to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to * * * handle or work on any goods * * * or to perform any services * * * where * * * an object thereof is * * * (B) forcing or requiring any person to cease * * * dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * *".

Differences in terminology between the current 8(b) (4) (B) and the 8(b) (4) (A) in force at the time of the alleged unfair labor practices are of no significance in this case.

late Senator Taft). The doctrine, and the reasons for it, were well summarized by Chief Judge Lumbard in the Royal case, supra, at pages 558–559:

> "Where an employer is attempting to avoid the economic impact of a strike by securing the services of others to do his work, the striking union obviously has a great interest, and we think a proper interest, in preventing those services from being rendered \* \* \* We therefore hold that an employer is not within the protection of § 8(b) (4) (A) when he knowingly does work which would otherwise be done by the striking employees of the primary employer and where this work is paid for by the primary employer pursuant to an arrangement devised and originated by him to enable him to meet his contractual obligations."

■ This ally doctrine is not applicable here. Courter did not "farm out" fabrication to Midwest or have any business dealings with Midwest. True, it informed Edison that it could not perform on schedule, thus paving the way for Edison to exercise its contractual privilege of withdrawing work from Courter. But the evidence stands uncontroverted that Edison gave the work to Midwest without the advice or knowledge of Courter. To bring these facts within the Ebasco-Royal doctrine would require a holding that Edison was somehow Courter's agent, a holding that would fly in the face of reality. The facts that Courter shipped certain valves and fittings used in pipe fabrication to Edison which Edison reshipped to Midwest, that Courter-Edison and Midwest-Edison business relationship continued, and that Edison's president had a son who was a Midwest salesman, do not change the situation. And even if, as the respondents argue, Courter's original bid as submitted to Edison, in that it was based on shop fabrication when it had no shop of its own for that purpose, contemplated a breach of the collective agreement as a result of which Edison became an "ally" in the breach, this would not make Courter and Edison allies in the award to Midwest.

■ The respondents' principal argument is that under § 8(b) (4) (A) Courter was a "primary" employer involved in a "primary" dispute with the respondents who, by their concerted refusal to permit members of the respondent Union to handle Midwest pipe, properly sought to compel Courter to conform to its union contract by fabricating all the pipe called for in the Edison contract and thus provide work for the members of Local 638. We may assume, *arguendo*, that under the hypothesis just stated such conduct would not constitute an unfair labor practice under § 8(b)(4)(A).

This argument, however, is predicated upon a faulty and incomplete view of the controlling facts. For when Courter's employees refused to handle Midwest pipe, the fabrication of the pipe was no longer a part of Courter's contract with Edison: it was an operation wholly within the control of Edison and hence not within Courter's contract with the respondent Union. And an abundance of evidence supported the Board's finding that the refusal to handle Midwest pipe had as an object "to compel Edison to cease doing business with Midwest and to cease using \* \* \* pipe fabricated by \* \* \* any other employer other than Courter." That finding brings the case within not only the spirit but even the precise letter of § 8(b) (4) (A). Cf. N. L. R. B. v. Local 11, etc., Carpenters, 6 Cir., 242 F.2d 932. Plainly the respondent unions had induced their members who were "employees of any employer [Courter] to engage in \* \* \* a concerted refusal in the course of their employment [by Courter] to \* \* \* handle or work on any goods [Midwest pipe] \* \* \* where an object thereof is: (A) forcing or requiring any employer [Edison or Midwest] to cease using, \* \* \* or otherwise dealing in the products of any other producer [Midwest] or to cease doing business with any other person [Midwest or Edison]." We hold, accordingly, that the Board's find-

ings may not be disturbed and that its order should be enforced.

Our conclusion has direct support from the decision of Local No. 636, United Ass'n, etc. v. N. L. R. B., C.A.D.C., 278 F.2d 858. The respondents attempt to distinguish the instant case from Local 636 on the ground that here, under the Courter-Edison contract, the work of fabricating was initially entrusted to Courter and hence "rightfully belonged to Courter's steamfitter employees" from whom it was thereafter taken away (quoting from respondents' brief). But the attempted distinction is specious: it overlooks the fact that it was under the construction contract that the work was withdrawn from Courter so that here, as in Local 636, *at the time the unfair act was committed* the work was wholly within the control of Edison.

The Board's order is, however, too broadly drawn, since it orders the respondents to cease and desist from inducing the employees of Courter *or of any other employer* to engage in a concerted refusal to handle goods, where an object thereof is: (1) to force or require Edison to cease dealing in the products of Midwest *or of anyone else who does not fabricate its products at Edison's job sites;* (2) to force or require Edison to cease doing business with Midwest *or anyone else who does not fabricate its products at Edison's job site;* or (3) to force or require Courter, Midwest, *or anyone else* to cease doing business with Edison. The Board's power to issue cease-and-desist orders extends only to acts found to be unfair labor practices, 29 U.S.C.A. § 160(c) ("an order requiring such person to cease and desist from such unfair labor practice"). There was no evidence in the record that the respondents attempted to influence anyone else's employees than Courter's, or that the respondents sought to compel Courter or anyone other than Midwest to cease doing business with Edison. Therefore, the order should be narrowed by deleting the portions of the order which we have italicized. An administrative agency, like a court, should decide only that which is brought before it. See N. L. R. B. v. Express Pub. Co., 312 U.S. 426, 433, 61 S.Ct. 693, 85 L.Ed. 930; Local 636, supra, 278 F.2d at page 865. And the notice required by clause 2, of course, should be altered to conform with the change in the order.

Order modified and enforcement granted.

### On Petition for Rehearing

**PER CURIAM.**

Since the respondents did not except to the breadth of the order recommended by the Trial Examiner, the order adopted by the Board should not not have been modified because of its breadth. In providing for enforcement petitions by the Board to the courts of appeal, Congress expressly limited the scope of judicial review. It cautioned: "No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." Sec. 10 (e) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 160(e). In cases involving the breadth of orders of the Board, this limitation was recognized by this court in N. L. R. B. v. Steel, etc., Fabricators, & Warehousemen, Local 810, Int'l Bhd. of Teamsters, 253 F. 2d 832, 834, and in Precision Fabricators v. N. L. R. B., 204 F.2d 567, and indeed, is required by N. L. R. B. v. District 50, United Mine Workers of America, 355 U.S. 453, 78 S.Ct. 386, 2 L.Ed.2d 401. The decision in Communications Workers v. N. L. R. B., 362 U.S. 479, 80 S.Ct. 838, 4 L.Ed.2d 896, is not to the contrary. It does not there appear that the breadth of the order which the court narrowed had not been objected to before the Board and the brief, unanimous, *Per Curiam* opinion contains nothing to suggest that the court intended to overrule its recent holding in N. L. R. B. v. District 50, United Mine Workers of America, supra, also a unanimous decision.

We note that in N. L. R. B. v. Ochoa Fertilizer Corporation, 1 Cir., 283 F.2d 26, and N. L. R. B. v. Brandman Iron Co., 6 Cir., 281 F.2d 797, those courts assumed to narrow orders not objected to before the Board. But those cases seem not to reconcile the action taken with the jurisdictional limitation of Sec. 10 (e) or with the Supreme Court decision cited above. We will therefore adhere to our earlier decisions.

Accordingly, the last paragraph of our opinion of November 25, 1960 is withdrawn and the order will be enforced without modification.