**LOCAL NO. 5, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPE FITTING INDUSTRY OF the UNITED STATES AND CANADA, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 17130.

United States Court of Appeals District of Columbia Circuit.

Argued March 26, 1963.

Decided June 6, 1963.

Mr. Donald J. Capuano, Washington, D. C., with whom Mr. Patrick C. O'Donoghue, Washington, D. C., was on the brief, for petitioner. Mr. Martin F. O'Donoghue, Washington, D. C., also entered an appearance for petitioner.

Mr. Gary Green, Atty., N.L.R.B., with whom Messrs. Stuart Rothman, Gen. Counsel at the time of argument, Dominick L. Manoli, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., were on the brief, for respondent.

Before BASTIAN, BURGER and WRIGHT, Circuit Judges.

BASTIAN, Circuit Judge.

This case is before the court on a petition to review and set aside an order of the National Labor Relations Board. The Board, in its answer, has requested enforcement of the order.

The facts of the case are as follows: On November 30, 1959, the Arthur Venneri Company [Venneri], a general contractor, was awarded a construction contract by the United States Corps of Engineers to build two airplane hangars at Andrews Air Force Base, Maryland. Venneri then subcontracted the inside plumbing work to Akron Mechanical Contractors, Inc. [Akron] and the outside utilities to Nickles Bros., Inc. [Nickles], an excavating contractor, which had a bargaining agreement with the Hod Carriers, Building and Common Laborers Union of America. After it had been awarded the subcontract, Akron entered into a bargaining agreement with petitioner, Local Union No. 5, United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada,

AFL-CIO [Local 5], to obtain union plumbers for the construction of the hangars. That agreement contained a clause which reads, in pertinent part:

"*32.* It shall be a violation of this agreement for any contractor to contract for a job where plumbing work has been withheld from the plumbing contract by either the owner or general contractor for the purpose of being installed by other than journeymen plumbers and their apprentices. * * * "

■ After the bargaining agreement was signed, Local 5 learned that Akron had accepted only inside plumbing work. Forthwith, it claimed jurisdiction over both the inside and the outside plumbing, objecting to Akron's acquiescence in the assignment of some of the plumbing work to Nickles, since installation of any plumbing by Nickles would violate clause 32 of the bargaining agreement. To further its claim, Local 5 refused to refer plumbers to work on the hangar jobs; and it induced Akron's employees to refrain from working on these projects, not to move pipe en route to the hangars, nor to fabricate pipe destined for these buildings. These actions both the Board and the trial examiner found violated § 8(b)(4)(i) and (ii)(B) of the Labor Management Relations Act, as amended.[1] We think the Board's determination has ample support in the record.

Respondent's argument rests on a triangular base. To sustain its findings the Board admits there must be substantial evidence in the record that (1) Local 5 induced the employees of Akron and threatened or coerced Akron (2) in order to affect the employment policies of an employer other than Akron (in this case Venneri), (3) one purpose of which was to force Akron to stop doing business with Venneri or, in the alternative, to force Venneri to stop doing business with Nickles. We shall consider these elements in reverse order.

First, the evidence is clear that Local 5 wanted one of two resolutions of this dispute: Either it wanted Akron to stop doing business with Venneri, or it wanted Venneri to stop doing business with Nickles. The record indicates that the union would not supply plumbers to Nickles, refusing to have anything to do with that employer. In addition, there is evidence that Local 5 would not do business with any excavating contractor. In view of this attitude, there is no way that the provisions of clause 32 could be followed while both Akron and Nickles remained on the plumbing job.

Since Venneri had entered into contractual relations with both Akron and Nickles by the time this controversy arose, we have no occasion to consider the union's interesting argument that it sought "to force Akron to 'refrain' from doing business with Venneri," an object which it urges is permitted by the wording of the statute. In the present controversy it is clear that the union sought to

---

1. 61 Stat. 139 (1947), as amended, 29 U.S.C. § 158 (Supp. III, 1959–61):

"*Unfair labor practices.*

\*     \*     \*     \*     \*

"(b) It shall be an unfair labor practice for a labor organization or its agents—

\*     \*     \*     \*     \*

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\*     \*     \*     \*     \*

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees * * *."

force Akron to cease doing business with Venneri or, in the alternative, to force Venneri to cease doing business with Nickles.

The record also indicates that the real target of the union's conduct was the subcontracting policy of Venneri. The union warned Venneri in December 1959, apparently before Akron was in the picture, not to split the plumbing work, and reminded the contractor of previous trouble they had experienced on this point. The union also warned Grossman, the president of Akron, before the bargaining agreement was signed, that accepting work from Venneri might mean trouble. Furthermore, the discussion at the meeting on February 15, 1960, between Local 5, Akron and Venneri clearly showed that the union's primary concern was with Venneri's subcontracting policies and not with the policies of Akron.

■ Buttressed by a persuasive record, the Board further relies on N. L. R. B. v. Enterprise Association, etc., 285 F.2d 642 (2d Cir., 1960) and Local 636, etc. v. N. L. R. B., 108 U.S.App.D.C. 24, 278 F.2d 858 (1960). Both of these cases reflect a situation similar to the present one, for in both the union brought pressure on a subcontractor who was powerless to settle the dispute, as is Akron here, in order to affect the purchasing policies of a general contractor. The only significant difference in this case is that the union attempted to influence the subcontracting policies of the general contractor, rather than its purchasing policies. There is nothing in the statute to indicate that this difference should produce a dissimilar result, for in both cases we have a secondary boycott.[2]

■ The union's principal reliance is on clause 32 of the contract, which we assume, *arguendo* only, is a legal contractual provision. On the basis of this clause, the union makes a two-pronged argument.

First, the union contends this clause demonstrates that its real dispute was with Akron, and not with Venneri, for it shows that the union's object was to change the employment policies of the immediate employer. The union presses on us a fine example of the *non sequitur*. Clause 32 no more demonstrates that the real target of the union's pressure was Akron than a "hot cargo" clause in the contract forbidding Akron to purchase non-union material would show that the union's dispute was with Akron, rather than its suppliers.[3] The subcontracting prohibition in Enterprise and the restriction on off-site fabrication in Local 636 do not demonstrate that the dispute was with a party to the contract. As we said in Local 636:

"The question is whether the contract provisions in question extend beyond the employer and are aimed really at the union's difference with another employer." 108 U.S.App. D.C. at 30, 278 F.2d at 864.

There is ample evidence in this case to show that the contract provision here in question was really aimed not at Akron, but at the union's difference with Venneri over the latter's subcontracting policies.

■ The second argument of the union is that, if clause 32 is a valid prohibition designed to preserve jobs or job content,[4] then the union can take the

2. Retail Clerks Union Local 770 v. N. L. R. B., 111 U.S.App.D.C. 246, 296 F.2d 368 (1961), cited by petitioner, does not support the union. The court there held that the Board's determination did not conform to the language of the statute. In Local 770, the employer had the power to satisfy the union's demands; there was no question of subcontracting and its unique problems.

3. To be sure, the purpose of a "hot cargo" clause may be different from the purpose of clause 32 (though this need not always be true), but the question before us is: At whom was the union's pressure directed? On this point the clause does not substantiate the union's contention.

4. The union urges that clause 32 is not a typical work protection clause exempted

measures here employed to enforce it. The Board correctly counters with the argument that Sand Door[5] disposes of this suggestion. That case teaches us that regardless of the legitimacy of the end sought by the union, it cannot engage in secondary pressure to obtain it. We find nothing in this case which distinguishes it from that rule. Admittedly, clause 32 is not identical to the "hot cargo" provision in Sand Door, but that case is not limited to "hot cargo" clauses. As the Supreme Court said:

" * * * [I]t seems most probable that the freedom of choice for the employer contemplated by § 8 (b) (4) (A) is a freedom of choice at the time the question whether to boycott or not arises in a concrete situation calling for the exercise of judgment on a particular matter of labor and business policy. Such a choice, free from the prohibited pressures—whether to refuse to deal with another or to maintain normal business relations on the ground that the labor dispute is no concern of his—must as a matter of federal policy be available to the secondary employer notwithstanding any private agreement entered into between the parties. * * * This is so because by the employer's intelligent exercise of such a choice under the impact of a concrete situation when judgment is most responsible * * * Congress may rightly be assumed to have hoped that the scope of industrial conflict and the economic effects of the primary dispute might be effectively limited." Local 1976, etc., Carpenters' Union v. Labor Board, 357 U.S. 93, 105–106, 78 S.Ct. 1011, 1019, 2 L.Ed.2d 1186 (1958).

■ We realize that this conclusion may leave the union with a valid contractual provision and with no means of enforcing it other than in a civil suit.[6] We also realize the difficulty the building crafts have with the secondary boycott provisions of the Labor Management Relations Act,[7] but this court is not the forum in which to seek relief from what the union characterizes as "the shackles" of this statute.

■ The union also offers various subsidiary arguments. For example, it urges that the union's conduct should be sanctioned because Akron violated its contractual promise. Of this there is little doubt, but that is beside the point, for a secondary boycott is not justified, even when used as a retaliatory weapon.

Likewise beside the point is the argument that the Union used restraint in this dispute.[8] Even if this were true, such restraint does not indubitably indicate a permitted object. It may indicate, as it does here, merely a restrained manner of pursuing a proscribed end.

■ Thirdly, the union contends that its refusal to refer employees to Akron

under the provisions of § 8(e) of the Act. On appeal the Board does not argue this point. We therefore decline to pass upon the question of whether this is a § 8(e) exemption clause and whether such an exempted clause may be enforced by means proscribed by § 8(b) (4) (B). We also assume, arguendo, that clause 32 is a valid prohibition even though it does not come within the § 8(e) exemption.

5. Local 1976, United Brotherhood of Carpenters' etc., Union v. N. L. R. B., 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958); see also N. L. R. B. v. Bangor Building Trades Council, 278 F.2d 287 (1st Cir., 1960).

6. Cf. Previant, Boycotts under the 1959 Amendments, XIII N.Y.U. Conf. on Labor, 141 at 169.

7. Meyer, "Ally" or "Neutral"—The Secondary Boycott Dilemma, 34 Tulane L.R. 343, 349–52 (1960); Segal, Differences among Secondary Boycotts and the Taft-Hartley Act, 5 Wayne L.R. 195, 205–8 (1959); Previant, supra note 6; Aaron, The Labor-Management Reporting & Disclosure Act of 1959, 73 H.L.R. 1086, 1112–1121 (1960). Note, The Impact of the Taft-Hartley Act on the Building and Construction Industry, 60 Yale L.R. 672, 689 (1951).

8. Cf. Local 761, International Union of Electrical Workers v. N. L. R. B., 366

was not to "threaten, coerce, or restrain any person," within the meaning of the Act. We need not pass on the contention of the Board that any refusal to refer employees is to coerce or restrain. The facts in this case demonstrate, perhaps not as clearly as one might wish, but nevertheless adequately to sustain the Board's finding, that Akron was in fact dependent upon the union for employees and the union's refusal under such circumstances was to "coerce or restrain," within the meaning of the Act.

▆▆▆ The union urges in addition that § 8(b) (4) (B) and § 8(b) (4) (D) are mutually exclusive, so that in the present case, where the union has been accused of violating both sections, the Board cannot determine a union violation of § 8(b) (4) (B) before it determines the jurisdictional question under § 8(b) (4) (D). The Board answers that the two sections are not mutually exclusive, so that, even if the union prevails in the jurisdictional question, a secondary boycott is not permitted.

The Board has held that where a primary employer alone is involved, and the union has been charged with violation of § 8(b) (4) (D) as well as with some other violation of the statute, the § 8(b) (4) (D) determination will take precedence. This does not mean, however, that when a secondary employer is involved a § 8 (b) (4) (D) determination must precede a determination of the secondary boycott. The secondary boycott provisions of the Act were designed to restrict the field of combat in industrial disputes. § 8(b) (4) (B) attempts to isolate labor disputes by declaring "off limits" to union pressure certain employers who are powerless to resolve a dispute between the union and another employer. To that end the Board has correctly concluded that, where the union brings pressure on one of these "neutral" parties, that activity is proscribed regardless of the jurisdictional question. The union would have to restrict its pressure in such a situation to the employer who can satisfy its demands.

The case cited to us by the union to show that the Board has changed its mind about §§ 8(b) (4) (D) and 10(k),[9] does not justify the position for which it is offered. In that case the union took direct action against the primary employer. There was no question of a secondary boycott. All that was there decided was that, in a primary dispute, the jurisdictional question should be resolved before the other primary questions.

▆▆▆ Finally, the union contends that the present order is too broad. This order directed the union to cease and desist from:

"(a) Engaging in, or inducing or encouraging employees of [Akron], or of any person engaged in commerce or industry affecting commerce, to engage in a strike or refusal in the course of their employment to use * * * any goods * * * or to perform any services where an object thereof is to force or require [Akron], or any other employer or person to cease doing business with [Venneri], or to force or require [Venneri] or any other person to cease doing business with [Nickles].

"(b) Threatening that it will not refer or otherwise furnish individuals for employment to [Akron], or any other person engaged in an industry affecting commerce, according to the provisions of an applicable contract, or refusing to refer such individuals for employment, in order to force or require [Akron], or any employer or other person to cease doing business with [Venneri], or to force or require [Venneri] or any other person to cease doing business with [Nickles]."

The union objects to the inclusion of the words "or any other person" in the

U.S. 667, 81 S.Ct. 1285, 61 L.Ed. 592 (1961).

9. Local 502 Hod Carriers v. N. L. R. B., 140 N.L.R.B. #69, 52 L.R.R.M. 1092; 63–1 CCH N.L.R.B. § 12,032.

order since there is no showing that any companies except Akron, Venneri and Nickles are involved in the present controversy. There is evidence, however, that the union's activities were directed not only to forcing Venneri to terminate Nickles' plumbing subcontract but also to forcing Venneri not to subcontract part of the plumbing work to any utility subcontractor. It is possible that the order might be construed to cover situations far removed from the present one, but in so far as this order attempts to prohibit the union from bringing similar pressure on a subcontractor to force Venneri to cease doing business with a utility subcontractor, it is valid. Cf. Bakery Wagon Drivers v. N. L. R. B., 115 U.S. App.D.C. ——, 321 F.2d 353 (1963).

The union is quite correct, however, in urging that any reference to the Corps of Engineers in the "Notice to All Employees," whose publication is required by the Board, should be stricken. There is no evidence of any threat or coercion to force the Corps of Engineers not to do business with Venneri.

As modified, the order will be enforced.

So ordered.