John A. **PENELLO**, Regional Director of the Fifth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD

v.

**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION** and Local 1355, International Longshoremen's Association.

Civ. No. 15270.

United States District Court
D. Maryland.

March 12, 1964.

David C. Sachs, Regional Atty., and Lawrence S. Wescott, Field Atty., N. L. R. B., Baltimore, Md. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel and Julius G. Serot, Asst. Gen. Counsel, N. L. R. B., Baltimore, Md., on the brief), for petitioner.

John J. O'Connor, Jr., and Cosimo C. Abato, Baltimore, Md. (O'Connor & Preston and Bracken, Abato & Mogowski, Baltimore, Md., on the brief), for respondents.

Jervis Spencer Finney, Baltimore, Md., for Ocean Shipping Service, Ltd.

THOMSEN, Chief Judge.

This petition filed by the Regional Director of the Fifth Region of the National Labor Relations Board (the Board), pursuant to sec. 10(1) of the National Labor Relations Act[1] (the Act), seeks a temporary injunction pending final adjudication by the Board of the matter involved in a charge filed by Ocean Shipping Service, Ltd. (Ocean) alleging that respondents, International Longshoremen's Association (ILA) and Local 1355 ILA, have engaged in and are engaging in unfair labor practices within the meaning of sec. 8(b) (4) (ii) (B) of the Act.[2]

To warrant an injunction under sec. 10(*l*), the Court must find that there is reasonable cause to believe that a violation of the Act, as charged, has been committed, and that injunctive relief is just and proper. The Court is not called upon to decide whether in fact a violation

of the Act has been committed; that question is for the Board, subject to review by a Court of Appeals pursuant to secs. 10(e) and (f) of the Act.[3]

The portions of sec. 8(b) applicable to this case read as follows:

"Sec. 8 * * *

"(b) It shall be an unfair labor practice for a labor organization or its agents—* * *

"(4) * * *

"(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

* * * * * *

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, * * *."

The petition alleges in substance that petitioner has reasonable cause to believe that the charges are true and that a complaint under sec. 10(b) should issue; that respondents have failed and refused, upon request, to refer, furnish and supply employees represented by respondents to Maryland Ship Ceiling Company for work on the S.S. Tulse Hill, which is owned by Ocean; that such failure and refusal constitute threats, coercion or restraint within the meaning of sec. 8(b) (4) (ii); that an object thereof was to force or require Maryland Ship Ceiling to cease doing business with Ocean; and that injunctive relief is just and proper.

1. As amended September 14, 1959, 73 Stat. 544, 29 U.S.C.A. § 160(*l*).

2. As amended September 14, 1959, 73 Stat. 542, 29 U.S.C.A. § 158(b) (4) (ii) (B).

3. National Labor Relations Board v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); Madden v. International Organization, etc., 7 Cir., 259 F.2d 312 (1958), cert. den. 358 U.S. 909, 79 S.Ct. 236, 3 L.Ed.2d 229; American Federation of Radio & Tel. Artists v. Getreu, 6 Cir., 258 F.2d 698 (1958); Local 450, International, Union of Op. Eng. v. Elliott, 5 Cir., 256 F.2d 630 (1958); Douds v. Milk Drivers & Dairy Employees Union, 2 Cir., 248 F.2d 534 (1957); Douds v. Wood, Wire & Metal Lathers International Ass'n, 3 Cir., 245 F.2d 223 (1957).

Respondents deny the allegations, and contend that the refusal to work on the Tulse Hill is based upon a patriotic policy of ILA and its members not to handle the ships of any owner whose vessels have engaged in trade with Cuba. They challenge the jurisdiction of the Board and of this Court on the grounds that the acts complained of do not affect commerce within the meaning of the Act, and that there is no labor dispute between respondents and Ocean.

### Facts

The formal findings of fact set out in note [4] are not disputed.

Ocean is a Bermuda corporation, engaged in the business of transporting cargo in foreign commerce, inter alia, between points in the United States and points in foreign countries. One of the ships which it operates under the British flag is the Tulse Hill.

Maryland Ship Ceiling is a Maryland corporation, engaged in the business of fitting vessels engaged in interstate and foreign commerce to receive cargo. Its annual revenues are about $200,000.

The ILA has organized the stevedores and other longshoremen in the Great Lakes, North Atlantic, South Atlantic and Gulf ports. Local 1355 is composed of about 227 ship ceilers and related specialists. A ship ceiler does rough carpentry work to fit a ship for carrying grain or some other cargo, working in gangs of one leader and four to twelve men, under the direction of the superintendent or foreman of a ship ceiling company or other employer engaged in similar work, on jobs which ordinarily last from one to two days. The gangs work out of the local's hiring hall, under a collective bargaining agreement between respondents and the Steamship Trade Association of Baltimore, Deepwater Steamship Lines, and Contracting Ship Ceiling Companies of Baltimore. The agreement provides that employees shall be hired through the union's hall in accordance with specified procedures.

The four ship ceiling companies ordinarily place their orders with the business agent of Local 1355 in the early afternoon for work to be done on the following day. Each company has its preferred or regular gang or gangs, but calls for such other gangs as may be available when additional men are needed for a particular job or the regular gang is not available.[5] The several leaders select the members of their gangs, and sometimes refuse to work a particular ship.[6] When Local 1355 does not have sufficient men available, the companies are usually able to obtain additional men from a local of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO, or from a group who work at the Coast Guard Depot.[7] Ship ceiling

---

4. Petitioner is Regional Director of the Fifth Region of the Board, an agency of the United States, and filed the petition for and on behalf of the Board.

Respondents, unincorporated associations, are organizations in which employees participate and which exist for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work. They are labor organizations within the meaning of secs. 2(5), 8(b) and 10($l$) of the Act.

Respondent Local 1355 maintains its principal offices at Baltimore, Maryland, and at all times material herein both respondents have been engaged within this judicial district in transacting business and in promoting and protecting the interests of their employee members.

5. Two stevedoring companies and a general ship servicing company also do ship ceiling work and call for gangs.

6. Usually because they feel the ship is unusually dangerous or that they are likely to be driven too hard by the proposed employer.

7. The agreement between respondents and the employers includes the following paragraph:

"5. When an insufficient number of men are available under the hiring procedure set forth in subparagraphs (1), (2), (3) and (4) above, to perform the work in a satisfactory manner, the party of the first part may employ such other men as are available, and the men so employed may continue to work until the end of the day's work for which they were employed, after which the regular hiring procedure will be again followed."

work includes the operation of a ship's winches to load lumber and for other purposes. The gangs referred by Local 1355 regularly include winchmen, and its members constitute a pool of workmen who have special qualifications for and experience in ship ceiling work.

Other ILA locals are composed of longshoremen who load and unload ships under a similar agreement with the stevedoring companies in Baltimore.

On October 8, 1962, the ILA issued the following printed press release:

"We, of the International Longshoremen's Association, were deeply gratified when we heard that President Kennedy was putting pressure on shipowners trading with Cuba.

"However, after analyzing the restrictions, the government intends to initiate we find it a step in the right direction but wanting in strength.

"We feel more stringent action is needed and while the government's proposals may slightly curb trade with Red Cuba, we, of the International Longshoremen's Association, intend to eliminate it.

"Following is the action the United States intends to take and the action the International Longshoremen's Association will take:

"1. *U.S. Action:* Close U.S. ports to all shipping of countries which have any vessel whatever engaged in carrying arms to Cuba.

"The ILA claims this proposal ridiculous because only Russian ships are taking arms to Cuba and Russian ships have not used U.S. ports since 1951 when the ILA membership refused to work them.

"While the U.S. proposes not to let Russian ships carry their cargoes to our ports, it will allow ships of other nations and U.S. flag ships to carry these same cargoes.

"The real culprit of the Cuban situation is Russia and yet we still trade with her. The International Longshoremen's Association will not work any cargo going or coming from Russia on any ship whether it is foreign or American. The ILA will also refuse to handle any Russian cargoes that is transhipped from one country to another.

"2. *U.S. Action:* Deny any U.S. Government cargo to foreign flag ships of any owners whose vessels are used in trade between Cuba and the Sino-Soviet bloc.

"The ILA claims this action weak because while the vessels used in trade with Cuba will be denied U.S. Government cargo, there is nothing to stop them from picking up commercial cargoes in United States ports.

"The International Longshoremen's Association will not load or unload U.S. Government, commercial or cargoes of any nature in ships of any owner whose vessels are used in trade with Cuba.

"3. *U.S. Action:* Flatly bar all U.S. owned ships from carrying goods to Cuba. Officials said they do not know of any such ships.
" * * * "

"4. *U.S. Action:* Close U.S. ports to any vessel which on a continuous voyage is employed in trade between Communist bloc countries and Cuba.
" * * *

"We urgently request the government to issue a list of companies and the names of their ships that carry goods to and from Cuba.—The lists should be made public for all to see."

Thereafter, sometime before December 20, 1963, the Department of Commerce (Maritime Administration) issued a memorandum to various government departments and agencies containing a list of vessels, including the Tulse Hill, which had arrived in Cuba since January 1, 1963. Under the policy established by the United States government, the listed vessels were ineligible to carry from the

United States cargoes financed by the government.

On or about December 20, 1963, a similar memorandum was issued, which also contained a list of vessels which had reacquired such eligibility. The government considers that a vessel reacquires eligibility when the persons who control the vessel undertake that no vessel under their control will be employed in the Cuba trade (except for certain prior contractual commitments), as long as it remains the policy of the United States government to discourage such trade. The Tulse Hill was listed among the vessels which had reacquired eligibility.

An "ILA Fact Sheet" issued in December, 1963, contained the following under the heading "CUBAN BOYCOTT":

"Our Cuban Boycott is still in effect and has been sanctioned by government action. If any of the ships listed below arrive at any ILA port, our membership is forbidden to handle them. Any ship on the list that enters an ILA port, should be reported immediately to John Bowers, International Executive Vice-President, at International Headquarters, in New York City (Phone collect to Code 212—WA 4-3111).

"There are now 58 British flag vessels on the list, 57 of Greek registry, 39 of Lebanese and the balance are scattered among nine other countries.

"The latest U. S. Maritime Administration blacklist covers the two week period ending November 15, 1963.

[There followed a list of the ships on the CUBA BLACKLIST, including "Tulse Hill—British". Then the following appeared in bold type.]

"It has been reported that many of these ships listed above will attempt to load wheat destined for Russia. Although the I.L.A., at the request of the United States Government, agreed to handle such wheat shipments, we have never agreed to work any of the above ships under

any circumstances. Be vigilant * * * Report any of these ships that enter your port * * * By no means work them."

On January 17, 1964, an executive vice-president of ILA sent the following telegram to the vice-president of its Atlantic Coast District, who passed it on to the officers of Local 1355:

"A British ship named Tulse Hill is due to arrive in Baltimore by Monday, Jan. 20. This ship has been to Cuba and is not to be loaded according to present ILA policy. Contact me when ship arrives for further instructions."

Meanwhile, pursuant to a continuing agreement with Ocean's agent, Maryland Ship Ceiling had undertaken to fit the Tulse Hill to receive a cargo of grain to be carried from Baltimore to Liverpool, England. The charge for the work would have been more than $5,000. Ocean's agent notified Maryland Ship Ceiling on January 20, 1964, that the "Tulse Hill" would arrive in Baltimore the following day. She docked at Pier 6, Pratt St., on January 21. Accordingly, on January 20 Maryland Ship Ceiling ordered five gangs from Local 1355 for January 21, to fit the Tulse Hill. On instructions from an ILA vice-president, Local 1355 refused to refer for that purpose any employees represented by respondents. On each succeeding day, up to and including January 24, Maryland Ship Ceiling ordered five gangs for work on the Tulse Hill; Local 1355 posted each "order" on the daily assignment board, but still refused to refer any employees represented by respondents for work on the Tulse Hill. Local 1355 has continued to supply men to Maryland Ship Ceiling for work on other vessels.

Attorneys for respondents contend that the gang leaders and members individually decided not to work on the Tulse Hill, but the Court finds that they were forbidden to work the Tulse Hill by the ILA through the Fact Sheet issued in December, 1963, and the telegram of January 17, 1964, and by the officers of Local 1355.

On January 25 the vessel moved from its berth at Pier 6, Pratt St., to an anchorage in Baltimore Harbor to await further developments.

Maryland Ship Ceiling made no effort to obtain men from the Carpenters' Union until February 17, the day of the first hearing in this case. The business agent of the Carpenters' Union testified at that hearing that he doubted whether his men would work the ship under the circumstances, and later stated that they would not.

Although Maryland Ship Ceiling might have been able, and might still be able, to find sufficient non-union carpenters to do the work, it would take some time; the lack of winchmen would present a costly problem; and there would have to be greater supervision by Maryland Ship Ceiling's superintendent and foreman than is necessary when the work is done by men drawn from the pool of labor experienced in this specialized work represented by Local 1355.

The acts complained of have impeded and interrupted the business of Maryland Ship Ceiling and of Ocean. There is reasonable cause to believe and the Court finds that they are "affecting commerce", as that phrase is defined in sec. 2(7) of the Act.[8]

### Discussion

The legislative history of sec. 8(b) (4) (ii) and the cases which have construed it show that a union's refusal to refer employees under a hiring hall system was one of the practices Congress intended to prohibit by the 1959 amendment. Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 (G.P.O.1959), pp. 1194, 1568, 1581. See also pp. 475, 942, 975-6, 989, 1079, 1193, 1453-4; U.S.Code Congressional and Administrative News 1959, p. 2318. N. L. R. B. v. Local 825, Int'l Union Op. Eng., 3 Cir., 315 F.2d 695, 697-698 (1963), enforcing 135 N.L.R.B. 578; Local No. 5, United Ass'n of Journeymen, etc. v. N. L. R. B., 116 U.S.App.D.C. 100, 321 F.2d 366 (1963), enforcing 137 N.L.R.B. 828; N. L. R. B. v. Highway Truckdrivers & Helpers, Local No. 107, 3 Cir., 300 F.2d 317, 320-1 (1962).

The facts found above show that the refusal of Local 1355 to refer men for work on the Tulse Hill, pursuant to the instructions received from ILA, constituted restraint and coercion by respondents within the meaning of the Act.

A reasonable, if not a necessary, inference from the facts found is that an object of such restraint and coercion was to force and require Maryland Ship Ceiling to cease doing business with Ocean. By restraining Maryland Ship Ceiling and other ship ceiling companies from fitting the Tulse Hill and other ships which have trade with Cuba, or by making the time and expenses of fitting such ships prohibitive, the ILA and its Locals hope to accomplish or to advance the purposes specified in the ILA Press Release of October, 1962.[9] It is not necessary that the prohibited object be the sole object of the coercion or restraint. National Labor Relations Board v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 689, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); International Brotherhood of Electrical Workers, etc. v. National Labor Relations Board, 341 U.S. 694, 700, 71 S.Ct. 954, 95 L.Ed. 1299 (1951).

Respondents argue that the Board and this Court lack jurisdiction over the subject matter of this case (1) because Ocean, a foreign corporation operating British flag ships and employing foreign seamen, is not an employer as defined in the Act, and (2) because there is no labor dispute between respondents and Ocean.

 It is true that a "secondary boycott", prohibited by sec. 8(b) (4) (ii)

---

8. "The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce." 29 U.S.C.A. § 152(7).

9. Of course, the threat by ILA to refuse to load such ships is an even more serious "threat, coercion or restraint".

170

(B), usually involves not only a neutral secondary employer who is threatened, coerced or restrained, but also a primary employer with whom the union has a labor dispute. But the statute and the reported cases make it clear that the primary person involved need not be an employer within the meaning of the Act.

Sec. 8(b) (4) (ii) (B) makes it an unfair labor practice for a labor organization or its agents to threaten, coerce or restrain *any person* engaged in commerce or in an industry affecting commerce [10] where an object thereof is forcing or requiring any person (i. e. Maryland Ship Ceiling) to cease doing business with "any other person". Broader language can scarcely be imagined. Ocean is certainly another person.

The decisions likewise hold that such "other person" need not be an employer covered by the Act. Local Union No. 25 of Intern. Brotherhood of Teamsters, etc., Union v. New York, New Haven & H. R. Co., 350 U.S. 155, 76 S.Ct. 227, 100 L.Ed. 166 (1956) (a railroad, subject to the Railway Labor Act rather than the NLRA); Plumbers', etc., Union v. Door County, 359 U.S. 354, 79 S.Ct. 844, 3 L.Ed.2d 872 (1959) (a county, specifically exempted from the NLRA); National Labor Rel. Bd. v. Washington-Oregon Shingle Weavers' Dist. Council, 9 Cir., 211 F.2d 149 (1954) (a Canadian manufacturer).

The cases cited by respondents, McCulloch v. Sociedad Nacional, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963), and Incres S. S. Co. v. International Maritime Workers, 372 U.S. 24, 83 S.Ct. 611, 9 L. Ed.2d 557, do not help them. Those cases hold that the Board does not have jurisdiction over the labor relations between the owner of a foreign flag vessel and a foreign crew. The instant case involves the legality of conduct engaged in by an American labor organization directed against Maryland Ship Ceiling, a domestic corporation engaged in commerce, with an object of forcing or requiring it to cease doing business with Ocean.

The distinction is spelled out in Incres, supra, where the New Haven case is reaffirmed and distinguished.

■ The nature of the controversy between the labor organization and the primary object of its attack (Ocean) is also immaterial. The cases cited make it clear that the controversy need not be an ordinary labor dispute. Respondents contend that their objection to working on the "tainted ship" is purely political, and that some sort of labor dispute or controversy with what their counsel aptly calls "the primary person under union interdict" is necessary to give jurisdiction to the Board and to the Court. Ocean, a foreign corporation operating British flag ships, manned by alien seamen, carrying cargo to and from the United States, is the primary person "under union interdict". If some labor purpose were necessary, the Court would have to find that the threats, coercion and restraint embodied in the October 1962 Press Release, the December 1963 Fact Sheet, and the respondents' refusal to refer men to fit the Tulse Hill, coupled with the threatened refusal to refer men to load her or any other vessel which has traded with Cuba, are related to the continuing effort of the Maritime Trades Department, AFL-CIO, and its affiliated organizations, including the ILA, as a unit, as individual unions, and associated in ad hoc groups, to promote and force the use of American flag ships, in order to increase employment opportunities for American seamen. That is not to say that a strong patriotic feeling on the part of the ILA and many of its members was not associated with the labor purpose.

This Court has jurisdiction to issue the requested injunction. But it does not necessarily follow that the issuance of an injunction at this time would be "just and proper".

The injunctive relief contemplated in sec. 10(*l*) is interlocutory to the final determination of the charge now pending before the Board. The legislative history

---

10. Maryland Ship Ceiling clearly comes within this definition.

of the Act shows that Congress intended the district courts to exercise the jurisdiction granted by sec. 10(*l*) to secure "prompt elimination of the obstructions to the free flow of commerce" which the relative slow procedures before the Board had failed to achieve.[11]

It is clear that respondents' actions are obstructing the free flow of commerce. Some of the other questions involved in this case are novel, and all parties have referred to it as a test case.

The propriety of injunctive relief in sec. 10(*l*) cases does not turn upon the criteria applicable in suits between private parties, but upon the necessity for effectuating the statutory policy. Hecht Co. v. Bowles, 321 U.S. 321, 331, 64 S.Ct. 587, 88 L.Ed. 754 (1944). "Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." Virginian Ry. Co. v. System Federation, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L. Ed. 789 (1937).

Temporary injunctions are usually issued to preserve the status quo. In this case, however, the issuance of such a temporary injunction as is requested might effectively dispose of the case and render illusory respondents' right to appeal, whatever its effect might be on their right to a hearing before the Board. On the other hand, refusal to issue an injunction may equally dispose of the matter, since it is doubtful how long Ocean can afford to keep the Tulse Hill idle in Baltimore Harbor.

All factors considered, the Court concludes that it should issue the requested injunction. If respondents wish to appeal to the Court of Appeals for the Fourth Circuit, this Court will grant a short stay to enable respondents to enter such an appeal and to apply for a stay from the Court of Appeals.

This Court expresses the hope that the Board will expedite the hearing of the

charge in this matter, so that a prompt decision on the merits may be had in the forum designated by Congress to make such a decision.

Counsel should submit an appropriate injunction within five days.

---

11. S.Rep. No. 105, 80th Cong., 1st Sess., pp. 8, 27, Legislative History of the Labor Management Relations Act, 1947 (G.P.O., 1948), Vol. I, pp. 414, 433.