**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CARPENTERS DISTRICT COUNCIL OF KANSAS CITY AND VICINITY, AFL–CIO, Respondent.**

**No. 19001.**

United States Court of Appeals
Eighth Circuit.

July 15, 1968.

Allen Berk, Atty., National Labor Relations Board, for petitioner, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Solomon I. Hirsh and Wayne S. Bishop, Attys., N.L.R.B., were on the brief.

Charles A. Werner, St. Louis, Mo., for respondent, Gibson Langsdale, Kansas City, Mo., was on the brief.

Before MATTHES, MEHAFFY and LAY, Circuit Judges.

LAY, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order finding the respondent, Carpenters District Council of Kansas City and Vicinity, AFL-CIO, had engaged in an unfair labor practice proscribed by §§ 8(b) (4) (i) and (ii) (B) of the National Labor Relations Act, relating to secondary boycott. We reverse and remand said proceeding for further evidence.

The dispute arises from three building projects in the greater Kansas City area during June of 1965. The Board of Trade Building project involved the general contractor, Winn-Senter Construction Company, and its subcontractor, Ceco Steel Products Company. Both companies employed union carpenters. At the Roeland Park State Bank Building project D. F. Cahill Construction Company was the general contractor. It employed union carpenters but its subcon-

tractor did not. And at the Hallmark Garage project, both the general contractor, Sharp Brothers Contracting Company, and its subcontractor, Ceco Steel employed union carpenters. Ralph H. McClain was the masonry subcontractor at both the Board of Trade and Roeland Park projects. Weldon B. Royse was the masonry subcontractor at the Hallmark Garage work site. On each project the masonry subcontractor was engaged to install precast concrete wall panels. Neither of the masonry subcontractors employed carpenters to work on their "precast installation" crews although these subcontractors employed union members from other trade crafts. All of the above named contractors and subcontractors are members of the Builders' Association of Kansas City, which served as the collective bargaining agent with the Carpenters Union. It is undisputed that the Union had a steward present at each job.

The Trial Examiner's findings were adopted by the Board and generally disclosed:

1. That on June 15, 1965, the Union President advised the Managing Director of the Builders' Association that the union carpenters would walk off the Board of Trade project unless carpenters were added to the precast concrete crews.

2. That the union stewards on all three projects were told to "walk off the job" unless carpenters were placed on the precast crew.

3. That at all three projects union representatives made the same statements to representatives of the primary contractors.

4. That statements attributed to the union personnel indicate that the walkoff would occur unless the masonry subcontractor hired a union carpenter.

5. That upon refusal of any of the contractors to hire carpenters for the "crew," the carpenters walked off each job. No pickets were placed on any of the projects. The carpenters remained off the job for three to five weeks.

The Board asserts that the above activities constituted a secondary boycott in violation of §§ 8(b) (4) (i) and (ii) (B).[1] It is contended that there existed an unfair labor practice through strikes against "neutral" employers, to-wit, the primary contractors, to force the "neutrals" to cease all business with the masonry subcontractors because the latter would not hire union carpenters. The contention of the Board is that the Union's dispute was with the masonry subcontractors and pressure was exerted on the primary contractors *to force* the subcontractors to hire carpenters. The Board's argument is that the Union was demanding the primary contractors to do something which they were powerless to do except by ceasing to do business with the subcontractors, and that this was an illegal object regardless of any proper motive the Union may have had. See Ohio Valley Carpenters Dist. Council, United Bhd. of Carpenters & Joiners of America, AFL-CIO v. NLRB, 339 F.2d 142, 145 (6 Cir. 1964).

On the other hand the Union urges that such strikes were brought about by a labor dispute with their own employer, the primary contractor, who was not a "neutral" since the employer wrongfully delegated the precast work to the

---

1. According to the respondent's brief:
   "The Section 8(b) (4) (B) unfair labor practice charge was filed on June 29, 1965. Prior to this date, on June 25, 1965, a Section 8(b) (4) (D) unfair labor practice charge was filed against the Union, based upon the same facts involved in this case. The 8(b) (4) (D) charge was pending at the time of the hearing in this case, and the charging party, Builders' Association of Kansas City, objected to the introduction of Union's Exhibit No. 1 (S.R. 16) in this case because of said pending 8(b) (4) (D) charge (S.R. 34) * * *.
   "There was no 10(k) hearing or hearing on the 8(b) (4) (D) charge, and said unfair labor practice charge was withdrawn on March 14, 1966, with the approval of the Regional Director, 17th Region, NLRB—*after* the hearing in this case on October 26 and 27, 1965."

masonry subcontractors. The Union denies that the strike was intended to force the contractors to cease doing business with their masonry subcontractors. The Union denies it was engaged in a dispute with the subcontractors or that an object of their strike was to cause cessation of the subcontractors' work. The Union pleads that there exists a current collective bargaining agreement between the members of the Builders' Association and the Union. The Union further pleads that for 15 years both the bargaining agreement and the area practice relating to work assignment have provided that at least one carpenter would be assigned as a member of a complete crew in the erection of precast materials on building and construction projects in the Kansas City area.

The usual scope of review relates to the sufficiency of the record under the standards laid down in Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). However, before reaching this plateau there is an initial inquiry as to whether, as a matter of law, the Board's findings would justify the legal conclusion reached.

A secondary boycott under §§ 8(b) (4) (i) and (ii) was reviewed in National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). The Supreme Court quoted from the Senate Committee Report as to the conduct prohibited: " * * * it would not be lawful for a union to engage in a strike against employer A for the purpose of forcing that employer to cease doing business with employer B * * *. S.Rep. No. 105, 80th Cong., 1st Sess., 22, I 1947 Sig.Hist. 428." Id. at 625, 87 S.Ct. at 1258. In other words, as the Court said, the target of such legislation was "union conduct which evidenced labor efforts to draw in neutral employers through pressure calculated to induce them to cease doing business with the primary employer." Id. at 624, 87 S.Ct.

at 1258. Thus it was "pressure tactically directed toward a neutral employer in a labor dispute not his own," that was proscribed. Id. at 623, 87 S.Ct. at 1257.

However, the Court added, " * * * congressional action to deal with such conduct has stopped short of proscribing identical activity having the object of pressuring the employer for agreements regulating relations between him and his own employees." Id. at 620, 87 S.Ct. at 1255. And the Court explained:

"The literal terms of [§ 8(b) (4) (B)] also were not applied in the so-called 'ally doctrine' cases, in which the union's pressure was aimed toward employers performing the work of the primary employer's striking employees. The rationale, again, was the inapplicability of the provision's central theme, the protection of neutrals against secondary pressure, where the secondary employer against whom the union's pressure is directed has entangled himself in the vortex of the primary dispute. '[T]he union was not extending its activity to a front remote from the immediate dispute but to one intimately and indeed inextricably united to it.' Douds v. Metropolitan Federation of Architects, 75 F.Supp. 672, 677 (D.C.S.D.N.Y.1948) (Rifkind, J.)."

The Board seeks enforcement of its order under the authority of NLRB v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).[2] However, the law seems clear where the primary object of the strike is the preservation of traditional union work subcontracted away by the employer, such pressure is not proscribed under § 8(b) (4) (B). NLRB v. United Brotherhood of Carpenters & Joiners of America, AFL–CIO, 261 F.2d 166 (7 Cir. 1958); NLRB v. Local Union No. 164, Int'l Bhd. of Elec. Workers, AFL–CIO, 388 F.2d 105 (3 Cir. 1968). See also NLRB v. Local 825, Int'l Union of Oper-

---

2. The Board likewise relies upon Local No. 5, United Ass'n of Journeymen, v. NLRB, 116 U.S.App.D.C. 100, 321 F.2d 366 (D. C.Cir. 1963) and United Ass'n Pipefitters Local Union 455, v. NLRB (second case, No. 18,200) 366 F.2d 815, 822 (8 Cir. 1966). These cases are factually dissimilar to the dispute presented here.

**14**

ating Engineers, AFL–CIO, 326 F.2d 218 (3 Cir. 1964); and Fibreboard Paper Prods. Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). The *Denver Building* case does not concern preservation of work, but demonstrates a secondary pressure to obtain an all union crew of the subcontractor. See discussion, NLRB v. United Brotherhood of Carpenters & Joiners of America, AFL–CIO, 261 F.2d at 171, supra.

■ Thus, we find that the Union's "walk-offs" were not prohibited conduct *if* the object of the strikes was to preserve traditional work reserved for the carpenters. This principle is reinforced in Houston Insulation Contractors, Ass'n v. NLRB, 386 U.S. 664, 87 S.Ct. 1278, 18 L.Ed.2d 389 (1967). The Board's approach finds this object is immaterial since there exists an illegal motive in attempting to force the primary contractor's cessation of work with the subcontractors. However, *if* the disputed work traditionally allows a carpenter within the "crew," and this is the request made by the Union, there exists no legal bases to support a finding of pressure "to force cessation of work." See NLRB v. United Brotherhood of Carpenters & Joiners of America, AFL–CIO, supra; NLRB v. Local Union 164, Int'l Bhd. of Elec. Workers, AFL–CIO, supra; and NLRB v. Local 825, Int'l Union of Operating Engineers, AFL–CIO, supra. The problem we face, however, is a record not sufficiently complete to determine whether there exists a union claim as to the disputed work. This right is asserted by the Union in the answer, but the collective bargaining agreement itself is not within the record, nor is any other testimony upon which this agreement might

be interpreted. For some unexplained reason, the attempt of the Union to offer evidence concerning area practice relating to work assignment as to precast installation crews was rejected by the Trial Examiner.

However, without a right based upon contract or area practice,[3] there may well be support for the Board's finding that the primary contractor was "neutral" and the Union's conduct prohibited. Under these circumstances, we accordingly vacate the Board's present enforcement order and remand to the Board for further proceedings, to take evidence as to the contract rights existing and the area practice relating to the work assignment.

Order vacated and remanded for further proceeding.

3. E.g. In Houston Insulation Contractors Ass'n v. NLRB, 386 U.S. 664 at 665, 87 S.Ct. 1278, at 1280, the collective bargaining agreement provided in part that employer would not contract out the disemployer wouldn ot contract out the disputed work. And in No. 206 of the same case, id. at 666, 87 S.Ct. at 1280, the Court quoted the Board concerning customary work:
"'[t]he conduct complained of herein

was taken to protest * * * a deprivation of work, its object being to protect or preserve for employees *certain work customarily performed by them.* This conduct constituted primary activity and is protected by the Act * * *.' 148 N.L.R.B., at 869." (Emphasis ours.)
See also Pipe Fitters Local No. 120, 168 N.L.R.B. No. 138 (Jan. 2, 1968).