William C. HUMPHREY, Regional Director of the Fifth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

DRIVERS, CHAUFFEURS & HELPERS LOCAL 639 affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Respondent.

Civ. No. 73-1212-W.

United States District Court,
D. Maryland.

Jan. 28, 1974.

Harvey A. Holzman, Atty., N.L.R.B., Fifth Region, Baltimore, Md., for petitioner.

Arrum M. Goldberg, Washington, D. C., for Dunbar Armored Express, Inc., charging party.

Solomon G. Lippman, Washington, D. C., for respondent; Bernard P. Jeweler, Edelman, Levy & Rubinstein, Baltimore, Md., of counsel.

WATKINS, Senior District Judge:

Upon complaint of Dunbar Armored Express, Inc. (Dunbar), the Regional Director of the Fifth Region of the National Labor Relations Board (Petitioner), on behalf of the Board, filed a petition with this Court pursuant to § 10(*l*)

of the National Labor Relations Act[1] (the Act) for injunctive relief alleging that the Respondent Union (the Union) was engaging in an unfair labor practice proscribed by § 8(b)(7)(C)[2] of the Act. Respondent filed an answer to said complaint, and memorandum in opposition to the relief prayed, and after oral argument, the case was, with the concurrence of the parties, held *sub curia* by this Court. This opinion is the result of those proceedings.

I

The facts of the case are essentially undisputed. Dunbar is a Maryland corporation providing armored car carrier service and employing, inter alia, certain employees commonly referred to as "guards" who are "driver-hoppers", full and part-time, "drivers" or "vaultmen". The Union is a labor organization which admits to membership employees other than guards.

On November 16, 1973, the Union filed with the Board a petition for representation requesting that it be certified as the collective bargaining representative for a unit of Dunbar's guard employees. The Regional Director either requested that the petition be withdrawn or notified the Union it was about to be dismissed. In any event the Union requested that the petition be withdrawn on November 29 and it was approved for withdrawal by the Board on November 30.

On December 3, 1973, the Union began to picket Dunbar in conjunction with a contemporaneous strike by the guard employees with an admitted object of forcing or requiring Dunbar to recognize the Union as the representative of the guards. The picketing continued until December 18 when it was voluntarily terminated pending the decision of this Court. On the same day that the picketing was terminated, the Union refiled a petition for certification with the Regional Director.

1. 29 U.S.C. § 160(*l*).

2. 29 U.S.C. § 158(b)(7)(C).

## II

The Union is charged with having committed, and this Court is petitioned to enjoin, an unfair labor practice in that the Union allegedly picketed for recognition in violation of § 8(b)(7)(C) of the Act which provides:

(b) *It shall be an unfair labor practice for a labor organization* or its agents—

(7) *to picket* or cause to be picketed, or threaten to picket or cause to be picketed, *any employer where an object thereof is forcing* or requiring *an employer to recognize* or bargain with *a labor organization as the representative of his employees,* or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, *unless such labor organization is currently certified as the representative of such employees:*

(A) where the employer has lawfully recognized in accordance with this subchapter any other labor organization and a question concerning representation may not appropriately be raised under section 159(c) of this title,

(B) where within the preceding twelve months a valid election under section 159(c) of this title has been conducted, or

(C) *where such picketing has been conducted without a petition* under section 159(c) of this title *being filed within a reasonable period of time not to exceed thirty days* from the commencement of such picketing: *Provided,* That *when such a petition has been filed the Board shall forthwith,* without regard to the provisions of section 159(c)(1) of this title or the absence of a showing of a substantial interest on the part of the labor organization, *direct an election in such unit as the Board finds to be appropriate* and shall certify the results thereof: Provided further, That noth-

ing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.[3]

The Union did file a petition for certification under 29 U.S.C. § 159(c) proportedly as required in § 8(b)(7)(C) which was later withdrawn and subsequently has been refiled. It is Petitioner's contention that the mere filing of "a" petition is inadequate to prevent the picketing from being an unfair labor practice within the meaning of § 8(b)(7)(C) because § 9(b) of the Act specifically provides that the Board, which is the body authorized to certify a bargaining representative, may not certify Respondent Union. § 9(b) provides:

(b) *The Board shall decide in each case whether,* in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, *the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof: Provided, That the Board shall not* (1) decide that any unit is appropriate for such purposes if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit; or (2) decide that any craft unit is inappropriate for such purposes on the ground that a different unit has been established by a prior Board determination, unless a majority of the employees in the proposed craft unit vote against separate representation or (3) *decide that any*

**3.** *Ibid.* [emphasis added].

*unit is appropriate for such purposes if it includes, together with other employees, any individual employed as a guard* to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; *but no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards.*[4]

The Respondent Union denies that the employees are guards within the meaning of § 9(b)(3). It further contends that even if they are guards within § 9(b)(3), nevertheless the filing of the petition meets the requirements of § 8(b)(7)(C) and acts to remove the picketing from the ambit of being an unfair labor practice, i. e., it stays the § 8(b)(7) limitation on the picketing.

### III

At the outset, it is important to note what this case is, and what it is not. It is a petition for a preliminary injunction pursuant to § 10(*l*) of the Act.[5] It is not a determination on the merits of a case involving the interpretation of the Act. As the Third Circuit has aptly pointed out:

> If, in a Section 10(*l*) proceeding, a district court or a court of appeals undertook to finally adjudicate such questions it would not be acting consistently with the congressional policy underlying Section 10(*l*). That Section's usefulness as a tool with which the status quo may be preserved pending final adjudication would be diminished insofar as the Board would be required to finally litigate questions

---

4. 29 U.S.C. § 159(b) [emphasis added]..

5. 29 U.S.C. § 160(*l*) provides:

(*l*) *Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of* paragraph (4)(A)(B), or (C) of section 158(b) of this title, or section 158(e) of this title or *section 158(b)(7)* of this title, *the preliminary investigation of such charge shall be made forthwith and given priority* over all other cases except cases of like character in the office where it is filed or to which it is referred. *If, after such investigation, the officer or regional attorney* to whom the matter may be referred *has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred,* is alleged to have occurred, or wherein such person resides or transacts business, *for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter.* Upon the filing of any such petition *the district court shall have jurisdiction to grant such injunctive relief* or temporary restraining order *as it deems just and proper,* notwithstanding any other provisions of law: Provided further, That no temporary restraining order shall be issued without notice unless a petition alleges that substantial and irreparable injury to the charging party will be unavoidable and such temporary restraining order shall be effective for no longer than five days and will become void at the expiration of such period: Provided further, That such officer or regional attorney shall not apply for any restraining order under section 158(b)(7) of this title if a charge against the employer under section 158(a)(2) of this title has been filed and after the preliminary investigation, he has reasonable cause to believe that such charge is true and that a complaint should issue. Upon filing of any such petition the courts shall cause notice thereof to be served upon any person involved in .the charge and such person, including the charging party, shall be given an opportunity to appear by counsel and present any relevant testimony: Provided further, That for the purposes of this subsection district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in promoting or protecting the interests of employee members. The service of legal process upon such officer or agent shall constitute service upon the labor organization and make such organization a party to the suit. In situations where such relief is appropriate the procedure specified herein shall apply to charges with respect to section 158(b)(4)(D) of this title. [Emphasis added].

of substance at a preliminary stage. Moreover, the court would not have the benefit of the Board's opinion on questions of fact and novel questions of labor law when making its decision. Thus, the court would, to some extent, usurp the Board's function as a primary fact finder in cases arising under the Act and its function as primary interpreter of the statutory scheme.[6]

This is not to say, as Petitioner asserts, that where the Regional Director finds reasonable cause to believe the charge is true, then the Court need only verify this finding and where here, as appears below, an issue is a novel one, the Court need only establish the reasonableness of *Regional Director's* belief in the validity of the charge.

The decided cases are less than clear on this question of the scope of the District Court's role in a § 10(*l*) proceeding. The statute itself is of discouragingly little assistance as it grudgingly states only that the Court "shall have jurisdiction to grant such injunctive relief . . . *as it deems just and proper,* notwithstanding any other provision of law."

A review of the cases decided under § 10(*l*) and § 10(j) (which sets out the same "just and proper" criterion in a similar section of the Act) indicates that in addition to the Court acting as a sort of analog to the criminal preliminary hearing judge, it must determine if the purposes of the Act will be frustrated unless temporary relief is granted.

In Minnesota Mining and Manufacturing Company v. Meter [7] (below cited as *3M*) which cites Angle v. Sacks [8] for authority, the Court refers to the legislative history of §§ 10(*l*) and (j) (*3M* was a § 10(j) case):

Experience under the National Labor Relations Act has demonstrated that by reason of lengthy hearings and litigation enforcing its orders, the Board has not been able in some instances to correct unfair labor practices *until after substantial injury* has been done. Under the present act the Board is empowered to seek interim relief only after it has filed in the appropriate circuit court of appeals its order and the record on which it is based. Since the Board's orders are not self-enforcing, it has sometimes been possible for persons violating the act to accomplish their unlawful objective before being placed under any legal restraint and thereby to make it impossible or not feasible *to restore or preserve the status quo pending litigation.* (Emphasis supplied.) Senate Report No. 105 on S. 1126, 1 Legislative History of the Labor Management Relations Act, 1947 at 433.[9]

The *Angle* court in holding that this additional finding must be made by the court stated:

We do think, however, that the legislative history indicates *a standard in addition to the 'probable cause' finding* that must be satisfied before a district court grants relief. The circumstances of the case must demonstrate that there exists a probability that the purposes of the Act will be frustrated unless temporary relief is granted. Administration of the Act is vested by Congress in the Board, and when the circumstances of a case create a *reasonable apprehension that the efficacy of the Board's final order may be nullified, or the administrative procedures will be rendered meaningless,* temporary relief may be granted under section 10(j). Preservation and restoration of the status quo are then appropriate considerations in granting temporary relief pending determination of the issues by the Board.[10]

---

6. Schauffler v. Local 1291, ILA (Northern Metal Co.), 292 F.2d 182, 187–188 (3 Cir. 1961).

7. 385 F.2d 265 (8 Cir. 1967).

8. 382 F.2d 655 (10 Cir. 1967).

9. 385 F.2d at 270 [emphasis in original].

10. 382 F.2d at 660 [emphasis added].

One of the cases that Petitioner cites as authority for his position, in fact lends little support and buttresses the conclusion reached by this Court. In Penello v. International Longshoreman's Assn.,[11] Judge Thomsen of this District wrote:

The propriety of injunctive relief in section 10(l) cases does not turn upon the criteria applicable in suits between private parties, *but upon the necessity for effectuating the statutory policy.*[12]

In choosing to follow this course in dealing with cases such as the case at bar, this Court is mindful of the fact that Congress did not make Regional Directors' decisions self-enforcing, but required resort to the courts to decide in what cases the injunctive relief is "just and proper". As a result the Court must reject Petitioner's argument regarding novel questions as being completely sufficient to justify relief, and must determine itself whether under the circumstances of the specific case the declared policy of the Act would be frustrated were relief not forthcoming. Included within this decision must be a finding that there exists reasonable cause to believe that (1) the Board will ultimately uphold the Regional Director, and (2) the ultimate Board decision will be, *within the declared purposes of the Act,* effectively negated or rendered moot unless the relief sought is granted.

### IV

■ The first question to be dealt with in determining whether an injunction should issue is whether the employees, herein involved, are guards within the meaning of 29 U.S.C. § 159(b)(3) (see text of this section in

Part II, above). The legislative history is of little or no assistance. However, this precise issue, that is whether armored car guards are § 9(b)(3) guards, was squarely faced by the National Labor Relations Board in the 1953 case of *Armored Motor Service* [13] which overruled an earlier decision [14] and held that armored car guards are guards within the meaning of § 9(b)(3). There, as here, the guards were employed to transport money and valuables and were uniformed, bonded, deputized and armed.

No subsequent cases to the contrary appear. Coupled with the substantial passage of time in which Congress has had opportunity to "correct" this interpretation, this would appear to be clearly the rule that the Board will apply, and this Court will not disturb such a ruling.[15] Indeed, it is a more than adequate basis for Petitioner's position on the issue when measured by the reasonable basis test.

### V

■ The next problem the Court faces is the determination of whether there exists reasonable cause to believe that the Respondent Union has committed an unfair labor practice within the meaning of § 8(b)(7)(C). That section proscribes the use of recognitional picketing (as is involved herein) by a labor organization, which is not the currently *certified* bargaining representative, in three instances:

A. Where another union is lawfully recognized as the representative and its status cannot be attacked;

B. where within the preceding twelve months a valid election has been conducted; and

---

11. 227 F.Supp. 164 (D.Md.1963).

12. *Id.* at 171 [emphasis added].

13. Armored Motor Service Co., Inc., 106 N.L.R.B. 1139.

14. Brink's, Incorporated, 77 N.L.R.B. 1182.

15. As a matter of first impression, this Court was inclined to interpret the word "guards" as relating to plant, or security

guards, who might be called upon by management to act in their *guard capacity* against their fellow employees, who, except for the ban of § 9(b)(3) might well be members of the same union as the guards. However, the ruling of the Board in Armored Car Service Co., Inc. is not implausible, and this Court does not feel entitled to substitute its visceral reaction for the Board's expertise and Congress' inaction.

C. where picketing has been conducted without a petition for certification having been filed within a reasonable time (and upon such petition being filed an expedited election is held in a unit deemed *appropriate* by the Board). The instant case obviously falls within this latter proscription, if any.

The section as a whole can be viewed as a comprehensive set of rules for recognitional picketing situations. In *Blinne Construction Co.*[16] the National Labor Relations Board discussed in detail the section's operation, noting particularly the effect intended by subparagraph C:

> [S]ubparagraph (C) provides that even where such picketing is not barred by the provisions of (A) or (B) so that picketing for recognition or organization would otherwise be permissible, such picketing is limited to a reasonable period not to exceed 30 days unless a representation petition is filed prior to the expiration of that period. Absent the filing of such a timely petition, continuation of the picketing beyond the reasonable period becomes an unfair labor practice. On the other hand, the filing of a timely petition stays the limitation and *picketing may continue pending the processing of the petition.* Even here, however, Congress by the addition of the first proviso to subparagraph (C) made it possible to foreshorten the period of permissible picketing by directing the holding of an expedited election pursuant to the representation petition.[17]

Immediately, it becomes clear that *Blinne* is referring to a situation where an election will be held in order to determine if the petitioning union, otherwise qualified, is to be certified, that is, whether it has majority status. Thus, the union may picket but the adverse effects which the statute seeks to avoid [18] are to be minimized by an expedited election.

Subparagraphs (B) and (C) serve different purposes. But it is especially significant to note their interrelationship. Congress was particularly concerned, even where picketing for recognition or organization was otherwise permissible, that the question concerning representation which gave rise to the picketing be resolved as quickly as possible. It was for this reason that it provided for the filing of a petition pursuant to which the Board could direct an expedited election in which the employees could freely indicate their desires as to representation. If, in the free exercise of their choice, they designate the picketing union as their bargaining representative, that union will be certified and it will by the express terms of Section 8(b)(7) be exonerated from the strictness of that section. If, conversely, the employees reject the picketing union, that union will be barred from picketing for 12 months thereafter under the provisions of subparagraph (B).[19]

It is obvious that in *Blinne* the Board did not have in mind the case of a noncertifiable union which could not be elected to representative status and certified by the Board as the bargaining representative due to a statutory prohibition like § 9(b)(3) as is the instant case. As is evidenced by the statutory language on its face, this situation may not have been anticipated by Congress because a possible loophole appears when the statute is applied to the facts of this case unless the statute is read as a comprehensive solution to the problem and the several parts as consistent and mutually supportive.

However, if it is assumed that, as the statute reads, the mere filing of a petition stays the limitation of the section

16. 135 N.L.R.B. 1153 (1962).

17. *Id.* at 1157 [emphasis added] [footnotes omitted].

18. *See* § 1 of the Act and the discussion in Part VI. *Also*, Roth, Injunctive Relief and the N.L.R.B., 43 St. John's L.R. 353 (1969).

19. 135 N.L.R.B. at 1158.

and allows picketing to continue pending the processing of the petition and the subsequent expedited election, two problems immediately arise. Firstly, the election is to be held by the Board in the unit deemed appropriate, and this unit is *per se* inappropriate by virtue of § 9(b)(3).[20] Secondly, if the section allows for such a union, although uncertifiable, to petition and then continue picketing the entire thrust of the section, that is the early termination of the adverse effects of such picketing would be frustrated. Additionally, this would give a noncertifiable union more freedom of action than a certifiable one.[21]

The Union asserts that the Board should hold the election and certify the results, although not certify the union as the bargaining representative (as it could not). As *Blinne* [22] demonstrates, this was neither Congress' intent nor the Board's interpretation. They both contemplated an election in which the union either won and was certified and thus was free of § 8(b)(7) proscriptions, or lost and was foreclosed from picketing by § 8(b)(7)(B). This would be the result of a consistent reading of the several sections as comprehensive and mutually supportive.

Notwithstanding the apparent Congressional intent, Congress did not specifically proscribe a union from picketing in such a situation as the Respondent Union finds itself although reading the section as a consistent whole would seem so to imply. Moreover, § 13 of the Act specifically states that:

> Nothing in this Act, except as specifically provided herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right.[23]

The Union therefore argues that if the language of § 8(b)(7)(C) does not specifically proscribe the picketing (in support of the strike), the right is undiminished and remains extant.

Several cases on first reading may appear in part to tend to support this position of the Union. In Rock-Hill-Uris, Inc. v. McCleod,[24] a mixed union of guards and non-guards was permitted on a ballot in an election for representation along with a qualified union. The court in dicta wrote that while such a union is foreclosed from being Board certified it is not foreclosed from being the representative or from achieving that status by wielding its economic power and thereby forcing the employer to recognize it. The court analogized this to the situations in which formerly, a union which refused to file certain affidavits, etc. regarding communist affiliations, although barred from invoking sanctions through the Board, was held still to be eligible to be collective bargaining representatives.[25]

This latter case held that since the statute specificially disallowed such a non-filing union certain benefits, when read in conjunction with § 7 [26] of the

---

20. Literally, a unit of guards only is not inappropriate *per se*. However, it is inappropriate in this context, since "no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership employees other than guards." 29 U.S.C. § 159(b)(3).

21. McLeod v. Security Gards and Watchmen, 333 F.Supp. 768 (S.D.N.Y.1971).

22. *Supra*, note 16.

23. 29 U.S.C. § 163.

24. 236 F.Supp. 395 (1964), aff'd, 344 F.2d 697 (2 Cir. 1965).

25. *See* N.L.R.B. v. District 50, United Mine Workers, 355 U.S. 453, 78 S.Ct. 386, 2 L. Ed.2d 401 (1958); United Mine Workers of America v. Arkansas Oak Flooring, 351 U.S. 62, 76 S.Ct. 559, 100 L.Ed. 941 (1956).

26. 29 U.S.C. § 157 reads:
Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain

738

Act which protects, inter alia, the rights of self-organization and representation of choice, such right was not denied beyond the specific enumerated disallowances. It is therefore arguably distinguishable because nowhere were other means employable (e. g., picketing or economic strikes) by those non-certifiable unions of gaining representative status proscribed. Here, however, the very tool which the admittedly non-certifiable union seeks to employ, that is, recognitional picketing, is regulated by § 8(b)(7)(C) which requires an election in an appropriate unit and the union here is statutorily disqualified from Board certification as the representative of the bargaining unit.

In the case of *Villa-Barr Company*,[27] the Board held that where due to policy reasons, the Board would not certify a one man unit, a union was free to picket notwithstanding this non-certifiability because if such picketing were disallowed, a one man unit could *never* be represented by a union. In the instant case, this is not true; only specific unions, i. e., mixed unions, may not represent these guards. The guards still have a wide-open channel to union representation and collective bargaining which was otherwise foreclosed to the one man unit since it could never be certified as such. The Board justified this conclusion in *Villa Barr* by pointing out that "there is no statutory or other policy" not to certify the one man unit beyond the Board's own policy of non-certification for such units. In the instant case

there is an express statutory policy against such certification of mixed unions of guards and non-guards, to wit: § 9(b)(3).

Certainly from the above it is clear that this issue, whether the union has committed an unfair labor practice, has two very substantial sides. While this Court feels that a consistent reading[28] of § 8(b)(7)(C) is more sensible[29] and the better of the arguments, this is not the issue. The very substantiality of the dispute operates to place the issue within the area in which the Regional Director may validly assert reasonable cause to believe the complaint is sound, and therefore, the only remaining issue is whether the purposes of the Act will be frustrated in the absence of injunctive relief. The Regional Director need not prove his case by a fair preponderance of the evidence, but only the existence of reasonable cause.

## VI

The decision to employ the injunctive mechanism of § 10(l), turning as it does (after reasonable cause to believe a violation has occurred has been established) on the vindication of the purposes of the Act, must serve actually to protect those interests sought to be protected by Congress. As stated earlier in this opinion (Part III, above), the Court must reasonably believe that the ultimate Board decision will be, within the declared purpose of the Act, effectively negated or rendered moot unless the relief sought is granted.

from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a)(3).

27. 157 N.L.R.B. 588 (1966).

28. By "consistent reading" the Court intends that the statute should be read as a comprehensive scheme and as a whole and without the apparent loophole through which Respondent would seek to filter by its reading of each of the separate provisions of § 8(b)(7) standing alone.

29. It may not be unreasonable to permit a non-certifiable union to appear on the ballot with one or more certifiable ones (Rock-Hill-Uris, Inc. v. McCleod, *supra*, note 24), thus allowing a complete expression of choice, at little, if any, increase in time and cost. The propriety of the expenditure of time and money to permit employees only to express whether, if it could be done, they would like a non-certifiable union to represent them, is at the best dubious.

Moreover, the word "election" throughout the Act seems to envisage cases in which the choice is for or against representation by a certifiable union, or a choice between certifiable unions.

The legislative history seems to indicate three basic purposes at which an injunction should be aimed:

1. The prompt elimination of the obstructions to the free flow of commerce engendered by the alleged unfair labor practice,

2. encouragement of the practice and procedure of free and private collective bargaining, and

3. the prevention of the possibility that persons violating the Act may accomplish their unlawful objectives before being placed under legal restraint.

The Senate report elaborates on these themes:

[T]he Committee has concluded that five specific practices by labor organizations and their agents, affecting commerce, should be defined as unfair labor practices. Because of the nature of certain of these practices, especially jurisdictional disputes, and secondary boycotts and strikes for specifically defined objectives, the committee is convinced that additional procedures must be made available under the National Labor Relations Act in order adequately to protect the public welfare which is inextricably involved in labor disputes.

Time is usually of the essence in these matters, and consequently the relatively slow procedure of Board hearing and order, followed many months later by an enforcing decree of the circuit court of appeals, falls short of achieving the desired objectives—the prompt elimination of the obstructions to the free flow of commerce and encouragement of the practice and procedure of free and private collective bargaining. Hence we have provided that the Board, acting in the public interest and not in vindication of purely private rights, may seek injunctive relief in the case of all types of unfair labor practices and that it shall also seek relief in the case of

strikes and boycotts defined as unfair labor practices. . . .

Experience under the National Labor Relations Act has demonstrated that by reason of lengthy hearing and litigation enforcing its orders, the Board has not been able in some instances to correct unfair labor practices until after substantial injury has been done. Under the present act the Board is empowered to seek interim relief only after it has filed in the appropriate circuit court of appeals its order and the record on which it is based. Since the Board's orders are not self-enforcing, it has sometimes been possible for persons violating the act to accomplish their unlawful objective before being placed under any legal restraint and thereby to make it impossible or not feasible to restore or preserve the status quo pending litigation.

In subsections (j) and (l) to section 10 the Board is given additional authority to seek injunctive relief. By section 10(j), the Board is authorized, after it has issued a complaint alleging the commission of unfair labor practices by either an employer or a labor organization or its agent, to petition the appropriate district court for temporary relief or restraining order. Thus the Board need not wait if the circumstances call for such relief, until it has held a hearing, issued its order, and petitioned for enforcement of its order.[30]

An injunction in the instant case would clearly eliminate the obstruction to commerce presented by the picketing in question and the failure to enjoin would leave those obstructions intact and thus frustrate that purpose of § 10(l). Furthermore, to permit picketing to continue would serve to discourage the practice and procedure of free and private collective bargaining by permitting a possibly unfair labor practice to be used by one party in an attempt to

30. S.Rep.No.105, 80th Cong., 1st Sess., 8, 27; 1 Legislative History of the Labor Management Relations Act of 1947, 414, 433 (1947).

force its position on the other party. In these two regards, the Declaration of Policy of the Act is revealing:

> It is the purpose and policy of this Act, in order to *promote the full flow of commerce,* to prescribe the legitimate rights of both employees and employers in their relations affecting commerce, *to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other,* to protect the rights of individual employees in their relations with labor organizations whose activities affect commerce, to define and proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce.[31]

For this Court now to refuse to enjoin the alleged § 8(b)(7)(C) violation would serve to thwart both the promotion of the full flow of commerce and the utilization of the peaceful and orderly procedures which Congress intended to flow from the proper application of the Act.

The third aim is somewhat more difficult to apply. While it is clear that, under these circumstances, an injunction would prevent the possibility of the Union accomplishing its objective of being recognized (although uncertifiable) as the bargaining representative of the guards by use of the allegedly unfair labor practice of picketing, and while it is also clear that if not enjoined the Union might succeed thereby; it is interesting to note the reverse side of the issue.

If the status quo prior to picketing is enforced by way of an injunction so as to prevent the Union from accomplishing its objective through proscribed picketing, that same status quo may cease to be a status quo when viewed from the position in which the Union might ultimately find itself. If the Union should prevail in the litigation to follow, an injunction having been issued herein, what will be the setting of the stage upon which the Board's order will work?

At oral argument, counsel for Respondent indicated that each of the striking employees has been replaced by the employer. If the strike is an economic one and not motivated by an unfair labor practice committed by the employer,[32] these empoyees are not entitled to reinstatement or back pay.[33] It is thus possible for the Respondent ultimately to, prevail and yet attain but a hollow victory.[34] There is even a conflict among the decided cases as to whether the traditional equitable consideration of relative hardship is applicable to a § 10(*l*) injunction[35] and thus properly to be considered.

In viewing the facts of the instant case, it is important to note that the Union could have presented these issues to the Board without a strike and the consequential danger of the strikers losing their jobs.[36] Thus, the Congressional policy preference for utilization of the peaceful orderly procedures would have been vindicated concomittantly with avoiding the possibility of either party accomplishing its objectives through unlawful means, here proscribed picketing, and it would have allowed each party to

---

31. 29 U.S.C. § 141(b) [emphasis added].

32. This issue is, of course, not before the Court and these remarks are only speculative in that no evidence has been presented thereon.

33. N.L.R.B. v. MacKay Radio and Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938).

34. The Union might conceivably prevail either in its interpretation of "guards" in § 9(b)(3) or in its interpretation of the scope of the § 8(b)(7)(C) proscription from picketing. The former might make the employ-

er's refusal to recognize it an unfair labor practice within § 8(a)(5) thus entitling the employees to reinstatement and back pay.

35. *Compare* Penello v. International Longshoremen's Assn., 227 F.Supp. 164 (D.Md. 1964) and Penello v. I.B.E.W. Local 26, 223 F.Supp. 44 (D.D.C.1963).

36. The Union could have tested the "guard" interpretation through a § 8(a)(5) unfair labor practice charge against Dunbar for refusing to bargain and it could have tested the § 8(b)(7)(C) interpretation by filing pursuant to § 8(b)(7)(C) and picketing without a strike being called.

be protected from the possibility of a "hollow victory" as now faces the Union.

This last point, while failing to ameliorate the possible very real hardship to the Union of an injunction, serves to undermine its equitable grounds for resisting an injunction; and combined with (1) the reasonable cause of the Regional Director to believe that the picketing is an unfair labor practice within § 8(b)(7)(C) and enjoined by § 10(l) and (2) the evident frustration of the statutory purposes of the Act if an injunction is not forthcoming, lead to the conclusion that it is "just and proper" within the meaning of § 10(l) for this Court to enjoin the picketing in question pending the final litigation of the questions raised herein.

The foregoing opinion embodies the Court's findings of fact and conclusions of law under Fed.R.Civ.P. 52(a) but further and more detailed findings will be entered upon request and presentation.

A preliminary injunction will be entered as prayed with leave to the Respondent to apply for a stay or dissolution if the case is not processed by the Board with all reasonable dispatch.