553 F.2d 1368
 94 L.R.R.M. (BNA) 3167, 45 A.L.R.Fed. 415,
180 U.S.App.D.C. 192,
81 Lab.Cas. P 13,138
 DRIVERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS, LOCAL NO. 71,
A/W INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF
AMERICA, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Wells Fargo
Armored Service Corporation, Intervenor.
 No. 75-2261.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 11, 1977.
Decided March 31, 1977.
 
 Hugh J. Beins, Washington, D.C., with whom Thomas H. Kohn, Arlington, Va., was on the brief, for petitioner.
 Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., with whom John S. Irving, Jr., Gen. Counsel and John F. Depenbrock, Jr., Atty., N.L.R.B., Washington, D.C., were on the brief, for respondent.
 Fred W. Elarbee, Jr., Atlanta, Ga., with whom Robert L. Thompson, Atlanta, Ga., was on the brief, for intervenor.
 Before BAZELON, Chief Judge, and McGOWAN and WILKEY, Circuit Judges.
 Opinion for the Court filed by Circuit Judge McGOWAN.
 Dissenting opinion filed by Chief Judge BAZELON.
 McGOWAN, Circuit Judge:
 
 
 1
 Petitioner, a labor organization within the meaning of Section 2(5) of the National Relations Act, 29 U.S.C. § 152(5), seeks review of an order of the National Labor Relations Board, dated December 23, 1975. 221 N.L.R.B. 1240. By that order, the Board found that petitioner had engaged in an unfair labor practice when it picketed the facilities of intervenor Wells Fargo Armored Service Corporation. The Board has cross-petitioned for enforcement of its order. We find the challenges made by the petitioner Union to that order to be unavailing, and we grant its enforcement.
 
 
 2
 * Wells Fargo, an armored car carrier service incorporated in Delaware (the "Company"), transports and delivers monies, securities, and other valuables for banks and commercial customers. The Company operates a facility at Charlotte, North Carolina, from which it services customers in North and South Carolina. The Charlotte office employs approximately 55 persons who work as "guards" on a full- or part-time basis.[1] Generally, the Company's armored trucks are operated by teams of three guards, two of whom enter customers' premises to make pickups and deliveries and one who remains in the truck. All of these employees wear uniforms, carry loaded weapons, are bonded for fidelity, and are authorized to carry weapons in North or South Carolina.
 
 
 3
 The Union admits to its membership employees other than guards. Since February 1975, it has demanded that Wells Fargo recognize it and bargain with it as the exclusive representative of the guard-employees at the Charlotte facility. In furtherance of its demands, the Union began to picket the Charlotte branch on March 18, 1975. The picketing ceased on March 24, 1975, after Wells Fargo filed an unfair labor practice charge against the Union, alleging a violation of Section 8(b)(7)(C) of the Act, 29 U.S.C. § 158(b)(7) (C). On March 27, 1975, the Union filed a petition requesting certification as the bargaining representative of the guard-employees.[2] On March 31, the agency's Regional Director in Winston-Salem, North Carolina, dismissed the representation petition on the ground that the employees in question were guards within the meaning of Section 9(b)(3) of the Act, 29 U.S.C. § 159(b)(3), and that therefore the Union, which admitted employees other than guards, could not be certified by the Board. The Union filed a timely request for review which was denied by the Board on May 23, 1975.
 
 
 4
 Meanwhile, from about April 9 until April 10, the Union renewed its picketing of the Charlotte facility. On April 14, 1975, after the Regional Director filed a petition for a preliminary injunction pursuant to Section 10(l ) of the Act, 29 U.S.C. § 160(l ), the Union volunteered to cease further picketing pending a decision by the United States District Court for the Western District of North Carolina, the court to which the application for injunctive relief was made.
 
 
 5
 On April 24, 1975, in response to the Company's charge that the Union had committed an unfair labor practice, the Regional Director issued a "Complaint and Notice of Hearing," alleging that the Union had picketed Wells Fargo's Charlotte facility in violation of Section 8(b)(7)(C) of the Act. The case was tried on a stipulation of facts without a hearing. The Administrative Law Judge issued his recommended decision on August 8, 1975, and ordered that the Union cease and desist its recognitional picketing of the Company. On December 23, 1975, a three-member panel of the Board, with one member dissenting, affirmed the rulings, findings, and conclusions of the ALJ and adopted his recommended order. 221 N.L.R.B. 1240.
 
 
 6
 Section 8(b)(7)(C) of the Act provides in pertinent part:
 
 
 7
 (b) It shall be an unfair labor practice for a labor organization or its agents
 
 
 8
 (7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:
 
 
 9
 (C) where such picketing has been conducted without a petition under section 159(c) of this title being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: Provided, That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 159(c)(1) of this title or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof . . ..
 
 
 10
 In the present case, the Union filed a petition for certification nine days after the picketing began. The Regional Director then dismissed the petition, and the Union resumed its picketing. The Board and the intervenor Company contend that the filing of a representation petition constitutes a defense to an unfair labor practice charge under Section 8(b)(7)(C) only if the petition raises a "valid question" concerning representation. They further allege that no valid question was raised by the Union's petition, because Section 9(b) (3) of the Act, 29 U.S.C. § 159(b)(3), specifically prevents the Board from certifying the nonguard Union as the representative of the guard-employees. That section provides:
 
 
 11
 (b) Determination of bargaining unit by Board
 
 
 12
 The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof: Provided, That the Board shall not . . .
 
 
 13
 (3) decide that any unit is appropriate for such purposes if it includes, together with other employees, any individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; but no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards.
 
 
 14
 The Union raises two alternative arguments to support the propriety of its picketing activities. First, the Union denies that the employees at the Charlotte facility are "guards" within the meaning of Section 9(b)(3). Second, the Union insists that even if applicable, the Section 9(b)(3) bar to certification does not constitute a prohibition against recognitional picketing; the filing of a timely representation petition under Section 8(b)(7) (C), so it is said, compels the Board to conduct an election and to certify its arithmetical results, even though it cannot certify a victorious union as the exclusive bargaining agent.
 
 II
 
 15
 In characterizing the Company's employees as Section 9(b)(3) guards, the Board announced no new doctrine. Rather, the Board merely adhered to agency precedent dating back to 1953 when, in Armored Motor Service Company, Inc., 106 N.L.R.B. 1139 (1953), it overruled a prior decision and held that armored car guards fall within the purview of Section 9(b)(3).[3] Since that time the Board has consistently rejected the narrow definition of guards propounded by petitioner.[4]
 
 
 16
 The Union contends that Armored Motor Service and its progeny contravene the history and purpose of Section 9(b)(3). We cannot agree. The numerous references to "plant guards" in the Act's legislative history[5] indicate only that in drafting Section 9(b)(3), Congress "may have had plant guards primarily in mind."[6] Nothing in that history evinces an intent to limit the application of Section 9(b)(3) to plant guards.[7] Presumably, so fundamental a restriction would have found expression in the statutory language of the provision.[8]
 
 
 17
 Moreover, the purpose of Section 9(b)(3) militates against the Union's proposed limitation. Reacting to the Supreme Court's decisions in NLRB v. Jones & Laughlin Steel Corp., 331 U.S. 416, 67 S.Ct. 1274, 91 L.Ed. 1575 (1947), and NLRB v. E. C. Atkins & Co., 331 U.S. 398, 67 S.Ct. 1265, 91 L.Ed. 1563 (1947),[9] Congress drafted a provision designed to minimize the danger of divided loyalty that arises when a guard is called upon to enforce the rules of his employer against a fellow union member.[10] The Union's argument untenably suggests that Congress either was blind to the potential for conflict inherent in employment contexts outside the plant or was convinced that the disincentive of withholding certification would not be necessary in those other contexts.[11]
 
 
 18
 The Board has determined that certification of a nonguard union as the representative of a unit of armored truck guards poses a significant danger of divided loyalty.[12] The Board's assessment of the potential for conflict is clearly within the realm of reason.[13] As an agency decision construing a statute continually applied by the interpreting agency, the Board's determination is entitled to judicial deference.[14] We must be particularly wary not to substitute judgment where, as here, the agency's expertise illuminates the meaning of an open-ended statutory term.[15] Congress' failure to alter the agency's longstanding interpretation of Section 9(b)(3) reinforces the propriety of our deferring to the Board on this issue.[16]
 
 III
 
 19
 The more puzzling issue in this case involves the relationship between Sections 9(b)(3) and 8(b)(7)(C) of the Act. Specifically, we must determine the effect under Section 8(b)(7)(C) of the filing of a representation petition by a picketing union barred from certification by Section 9(b)(3).[17] The legislative histories of the two provisions, which were enacted at different times, offer no guidance on this question.[18] As the Board noted in Local 639 (Dunbar Armored Express, Inc.), supra note 4, 211 N.L.R.B. at 690, "it is quite possible that this rare instance was one that was not foreseen by Congress." No other court has squarely resolved the problem posed by this conceivable lapse in the draftsmens' attention.[19]
 
 
 20
 Looking to the purpose and structure of Section 8(b)(7) generally,[20] the Board and the Company reason that Section 8(b)(7)(C) contemplates the filing of a petition that raises a legitimate question of representation, that is to say, a question that warrants the holding of an election, following which the petitioning union, if victorious, may be certified as the exclusive representative of the employees. The Union contests this analysis, charging that Sections 7 and 13 of the Act guarantee the right of recognitional picketing to an uncertifiable union absent an express statutory provision to the contrary.[21] Arguing that denial of certification is the sole restriction imposed by Section 9(b)(3), the Union insists that the filing of its representation petition entitled it to participate in a Board-conducted election, although only the numerical results could be certified. In support of this proposition, the Union cites agency decisions that allowed nonqualifying unions to appear on the ballot,[22] and judicial language to the effect that certifiability is not a prerequisite for a Board-conducted election.[23]
 
 
 21
 Our own analysis of the problem proceeds on the firmly established principle that Section 9(c) of the Act confers upon the Board a wide degree of discretion in determining whether a petition raises a "question of representation" warranting the direction of a Board-conducted election.[24] This measure of discretion extends to considerations involving limitations imposed by statute or public policy on the choice of bargaining representatives.[25] The Board's decisions in these matters are, as we stated in Miami Newspaper Printing Pressmen's Union Local 46 v. McCulloch, supra note 24, 322 F.2d at 998 n.11, "within that area of expertise in which courts hesitate to interfere."
 
 
 22
 Viewed from this perspective, the cases relied upon by the parties in the present case are reconcilable. Judicial opinions and agency decisions have consistently observed that the Board is not, under all conceivable circumstances, precluded from permitting a nonqualifying union to participate in the Board's election process.[26] Although the Union reads these cases to support its alleged right to a Board-conducted election, that reliance is misplaced. Fairly read, the cases establish, first, that in certain circumstances not present here the Board in its discretion will allow electoral participation by a nonqualifying union, and, second, that a reviewing court will sustain the Board's determination unless it constitutes an abuse of discretion. Cases involving the Board's refusal to order an election or to allow electoral participation illustrate the reverse factual situation, but the same legal principle of agency discretion.[27]
 
 
 23
 In the circumstances disclosed by the record before us, we are not prepared to say that the agency committed reversible error in declining to order an election. A Board-conducted election is a "costly-occasion."[28] The agency reasonably could conclude that an organization falling within the legislative limitations stated in Section 9(b)(3) should not be allowed to invoke the Board's processes.[29]
 
 
 24
 Thus the Regional Director did not act improperly in dismissing the Union's representation petition on March 31, 1975.[30] Despite the dismissal, the Union, with no reasonable prospect of a Board-conducted election, resumed its picketing on April 10, 1975. In doing so, the Union violated Section 8(b)(7) (C), which appears to contemplate picketing by way of prelude to an election.[31] To tolerate continued picketing after dismissal of the Union's petition would bestow on petitioner greater rights than are afforded qualifying unions,[32] and would, in particular, clothe the Union with a coercive power under circumstances in which Congress clearly did not intend it to exist.
 
 
 25
 The petition of the Union is denied; and the petition of the Board for enforcement is granted.
 
 
 26
 It is so ordered.
 
 BAZELON, Chief Judge, dissenting:
 
 27
 I cannot agree that armored-car guards can reasonably be considered to be guards within the meaning of § 9(b)(3). The legislative history clearly reflects, and the early Board cases recognized,[1] that § 9(b)(3) marks an extremely narrow exception to the National Labor Act's general policy of employee free choice.[2] In adopting this exception, Congress had in mind "plant policemen and guards (who) prevent disorders and report misconduct of employees and of unions and their members." H.Rep.No.245, 80th Cong., 1st Sess., 1947, p. 16. Employers, of course, need the undivided loyalty of employees basically charged with keeping the peace and protecting the plant. Application of the statutory exception here goes far beyond that purpose.[3]
 
 
 28
 Under my view of the case, there is no need to reach the second issue, and I offer no views on its proper resolution.
 
 
 
 [1]
 The word "guards" is not used in this context to denote the statutory term of art used in Section 9(b)(3) of the Act, 29 U.S.C. § 159(b)(3). The stipulation of facts submitted by the parties at the agency proceeding contains a complete description of the functions performed by employees in each of several job classifications. J.A. at 5-7
 
 
 [2]
 The process by which a union may obtain certification following a Board-conducted election is described in Section 9 of the Act, 29 U.S.C. § 159
 
 
 [3]
 Brink's, Inc., 77 N.L.R.B. 1182 (1948). Previously the Third Circuit, in N.L.R.B. v. American Dist. Tel. Co. of Pa., 205 F.2d 86 (3d Cir. 1953), had contemplated a broad definition of the term
 
 
 [4]
 See, e. g., Local 639, Internat'l Bhd. of Teamsters (Dunbar Armored Express, Inc.), 211 N.L.R.B. 687 (1974); American Dist. Tel. Co., 160 N.L.R.B. 1130, 1136-37 (1966); Potter Elec. Signal Co., 149 N.L.R.B. 373 (1964); cf. Sentry Investigation Corp., 198 N.L.R.B. 1074 (1972); Bonded Armored Carrier, Inc., 195 N.L.R.B. 346 (1972); Rock-Hill-Uris, Inc., 193 N.L.R.B. 313 (1971)
 
 
 [5]
 The House report, in describing management's need for "faithful agents," noted that "(p)lant policemen and guards prevent disorders and report misconduct of employees and of unions and their members." H.Rep.No.245, 80th Cong., 1st Sess. 16 (1947), reprinted in I NLRB, Legislative History of the Labor Management Relations Act, 1947, at 307 (1948). Comments during the Senate debates also focused on plant guards. See 93 Cong.Rec. 6601, 6603, 6658 (1947) (remarks of Senators Taft and Murray), reprinted in II NLRB, supra at 1541, 1544, 1572
 
 
 [6]
 Brink's Inc., supra note 3, 77 N.L.R.B. at 1188 (dissenting opinion of Member Murdock); cf. NLRB v. American Dist. Tel. Co. of Pa., supra note 3, 205 F.2d at 89-90; Armored Motor Service Co., Inc., 106 N.L.R.B. 1139, 1140 (1953)
 
 
 [7]
 The legislative history contains a number of references to Section 9(b)(3) wherein the term "guards" is not limited to the plant setting. See, e. g., H.Rep.No.510, 80th Cong., 1st Sess. 35-36, 48 (1947) (Conference Report), reprinted in I NLRB, supra note 5, at 539-40, 552, U.S.Code Cong.Serv.1947, p. 1135. The Statement of the Managers on the Part of the House defines a Section 9(b)(3) guard as "any individual employed as a guard to enforce against employees and other persons rules to protect property belonging to the employer or for which the employer is responsible, or to protect the safety of persons on the employer's premises." H.Rep.No.510, 80th Cong., 1st Sess. 48 (1947), reprinted in I NLRB, supra note 5, at 552, U.S.Code Cong.Serv.1947, p. 1153 (emphasis added)
 
 
 [8]
 Judicial and agency decisions have repeatedly rejected the argument that the language of Section 9(b)(3) implicitly exempts armored truck guards and similar employees from its coverage. Armored truck guards are obligated to protect from theft the employer's truck and vault as well as customers' valuables entrusted to the employer; the guards therefore are employed to enforce "rules to protect property of the employer," within the meaning of Section 9(b)(3). See, e. g., Local 639 (Dunbar Armored Express, Inc.), supra note 4, 211 N.L.R.B. at 689 & n.3; Armored Motor Service Co., Inc., supra note 6, 106 N.L.R.B. at 1140; Brink's Inc., supra note 3, 77 N.L.R.B. at 1188 & n.13 (dissenting opinion of Member Murdock); note 7 supra ; cf. American Dist. Tel. Co. of Pa., supra note 3, 205 F.2d at 89. In addition, Section 9(b)(3) specifically defines a guard as one who is employed to enforce management's rules "against employees and other persons . . ." (emphasis added)
 
 
 [9]
 In both cases, the Supreme Court held that the Board could order an employer to bargain with a union certified to represent a unit of plant guards, even though the union admitted nonguard employees. The legislative history of Section 9(b)(3) reveals that the two Supreme Court decisions triggered the drafting of the provision. 93 Cong.Rec. 6601, 6658 (remarks of Senators Taft and Murray), reprinted in II NLRB, supra note 5, at 1541, 1572; NLRB v. American Dist. Tel. Co. of Pa., supra note 3, 205 F.2d at 89-90
 
 
 [10]
 See id. at 90; Armored Motor Service Co., Inc., supra note 6, 106 N.L.R.B. at 1140
 
 
 [11]
 Although petitioner appears to restrict its attack to the Board's determination that Section 9(b)(3) applies to armored truck guards, the Union's interpretation of that provision would overrule sub silentio numerous other Board decisions that declined to restrict the application of Section 9(b) (3) to plant guards. See, e. g., Broadway Hale Stores, Inc., 215 N.L.R.B. 46 (1974) (fitting room checkers); The Wackenhut Corp., 196 N.L.R.B. 278 (1972) (security toll operators); American Dist. Tel. Co., supra note 4, 160 N.L.R.B. at 1136-37, and Potter Elec. Signal Co., supra note 4, 149 N.L.R.B. 373 (1964) (private servicemen who respond to fire or burglar alarm); Tulsa Hotel Management Corp., 135 N.L.R.B. 968, 971 n.8 (1962) (timekeepers); Walterboro Mfg. Corp., 106 N.L.R.B. 1383 (1953) (watchmen)
 The fact that the conflict in the Jones and Atkins cases arose in the plant setting, see note 9 supra, does not mean that Congress intended to draft a provision limited to the facts of those cases.
 
 
 [12]
 In Armored Motor Service Co., Inc., supra note 6, 106 N.L.R.B. at 1140, the Board stated:
 The danger of divided loyalty which Congress sought to eliminate may not be quite so far-reaching in the case of armored-car guards, but it is, nevertheless, present. A conflict of loyalty could arise, for example, if the guards should be called upon to deliver money or valuables to one of their customers whose employees were represented by the same union as represented the armored-car guards and the employees of the customer were on strike and picketing the premises of the customer.
 Cf. NLRB v. American Dist. Tel. Co. of Pa., supra note 3, 205 F.2d at 90.
 
 
 [13]
 Although the potential for conflict "may not be quite so far-reaching" as in the case of plant guards, we are not prepared to overturn the Board's determination and hold that the danger is insubstantial. See Humphrey v. Local 639, Internat'l Bhd. of Teamsters, 369 F.Supp. 730, 735 n.15 (D.Md.1974)
 
 
 [14]
 See, e. g., Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Columbia Gas Transmission Corp. v. FPC, 174 U.S.App.D.C. 204, 530 F.2d 1056, 1059 (1976); Natural Resources Defense Council, Inc. v. Train, 166 U.S.App.D.C. 312, 510 F.2d 692, 706 (1974); Bamberger v. Clark, 129 U.S.App.D.C. 70, 390 F.2d 485, 488 (1968)
 
 
 [15]
 In such a situation, the agency's determination must be accepted if it has warrant in the record and a reasonable basis in law. See, e. g., NLRB v. Hearst Publications, Inc., 322 U.S. 111, 131, 64 S.Ct. 851, 82 L.Ed. 1170 (1944); NLRB v. Doctors' Hosp. of Modesto, Inc., 489 F.2d 772, 776 (9th Cir. 1973); cf. NLRB v. United Ins. Co., 390 U.S. 254, 260, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968). In Humphrey v. Local 639, supra note 13, 369 F.Supp. at 735 n.15, the court noted:
 As a matter of first impression, this Court was inclined to interpret the word "guards" as relating to plant, or security guards, who might be called upon by management to act in their guard capacity against their fellow employees, who, except for the ban of § 9(b)(3) might well be members of the same union as the guards. However, the ruling of the Board in Armored Car Service Co., Inc. is not implausible, and this Court does not feel entitled to substitute its visceral reaction for the Board's expertise and Congress' inaction.
 
 
 [16]
 See Fuchs ex rel. NLRB v. Teamsters Local 671, 398 F.Supp. 243, 248 (D.Conn.1975); Humphrey v. Local 639, supra note 13, 369 F.Supp. at 735 & n.15
 
 
 [17]
 For convenience we will refer to such unions as "non-qualifying" or "uncertifiable."
 
 
 [18]
 Section 9(b)(3) was enacted in the Taft-Hartley Act of 1947. See ch. 120, tit. I, § 101, 61 Stat. 143. Section 8(b)(7)(C) did not become law until 1959, when Congress adopted the Landrum-Griffin Act. See Pub.L. No. 86-257, § 704(c), 73 Stat. 544
 
 
 [19]
 Several courts have considered the question in order to determine whether there was "reasonable cause" for the issuance of a preliminary injunction under Section 10(l ), 29 U.S.C. § 160(l ). See, e. g., Fuchs ex rel. NLRB v. Teamsters Local 671, supra note 16, 398 F.Supp. 243; Humphrey v. Local 639, supra note 13, 369 F.Supp. 730; McLeod v. Security Guards and Watchmen Local 803, 333 F.Supp. 768 (S.D.N.Y.1971). See also NLRB v. White Superior Div., White Motor Corp., 404 F.2d 1100, 1104 (6th Cir. 1968) (dictum)
 
 
 [20]
 Section 8(b)(7) prohibits recognitional picketing by an uncertified union
 (A) where the employer has lawfully recognized in accordance with this subchapter any other labor organization and a question concerning representation may not appropriately be raised under section 159(c) of this title,
 (B) where within the preceding twelve months a valid election under section 159(c) of this title has been conducted . . ..
 Noting that Section 8(b)(7)(C) was enacted as part of a "comprehensive code" governing recognitional and organizational picketing (NLRB v. Drivers Local 639, 362 U.S. 274, 291, 80 S.Ct. 706, 4 L.Ed.2d 710 (1960)), respondent and intervenor argue that Section 8(b)(7)(C), like Sections 8(b)(7)(A) and (B), proscribes recognitional picketing that will not culminate in the holding of a Board-conducted election. Respondent's Br. at 11-13, 16; Intervenor's Br. at 11-18. See generally International Hod Carriers Bldg. & Common Laborers Union of America (C.A. Blinne Constr. Co.), 135 N.L.R.B. 1153, 1156-58 (1962).
 
 
 [21]
 29 U.S.C. §§ 157, 163. These sections provide:
 § 157. Right of employees as to organization, collective bargaining, etc.
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.
 § 163. Right to strike preserved.
 Nothing in this subchapter, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right.
 
 
 [22]
 E. g., Burns Internat'l Detective Agency, Inc., 138 N.L.R.B. 449 (1962)
 
 
 [23]
 E. g., NLRB v. District 50, UMW, 355 U.S. 453, 461, 78 S.Ct. 386, 2 L.Ed.2d 401 (1958); Rock-Hill-Uris, Inc. v. McLeod, 236 F.Supp. 395, 398 (S.D.N.Y.1964), aff'd per curiam, 344 F.2d 697 (2d Cir. 1965); cf. UMW v. Arkansas Oak Flooring Co., 351 U.S. 62, 71-72, 76 S.Ct. 559, 100 L.Ed. 941 (1956)
 
 
 [24]
 See, e. g., Miami Newspaper Printing Pressmen's Union Local 46 v. McCulloch, 116 U.S.App.D.C. 243, 322 F.2d 993, 998 n.11 (1963); National Biscuit Div. v. Leedom, 105 U.S.App.D.C. 117, 265 F.2d 101, 103, cert. denied, 359 U.S. 1011, 79 S.Ct. 1151, 3 L.Ed.2d 1037 (1959); Independent, Inc. v. NLRB, 406 F.2d 203, 206 (5th Cir. 1969); Rock-Hill-Uris, Inc. v. McLeod, supra note 23, 236 F.Supp. at 398; cf. Brooks v. NLRB, 348 U.S. 96, 104, 75 S.Ct. 176, 99 L.Ed. 125 (1954)
 
 
 [25]
 See id.; cf. Rock-Hill-Uris, Inc. v. McLeod, supra note 23, 236 F.Supp. at 398, 399
 
 
 [26]
 See, e. g., NLRB v. District 50, UMW, supra note 23, 355 U.S. at 461, 78 S.Ct. 386; Rock-Hill-Uris, Inc. v. McLeod, supra note 23, 236 F.Supp. at 398; Burns Internat'l Detective Agency, Inc., supra note 22, 138 N.L.R.B. 449; The Wackenhut Corp., 169 N.L.R.B. 398 (1968). As a general matter, however, the certification of a bargaining representative is the raison d' etre of the electoral process. See International Hod Carriers Bldg. & Common Laborers Union, supra note 20, 135 N.L.R.B. at 1158, quoted in Humphrey v. Local 639, supra note 13, 369 F.Supp. at 736-37; Teamsters Local Union 115 (Vila-Barr Co.), 157 N.L.R.B. 588, 589 (1966)
 
 
 [27]
 E. g., Wackenhut Corp., 223 N.L.R.B. No. 17, 91 L.R.R.M. 1407 (1976) (Board declines to allow nonincumbent nonguard union to appear on ballot in guard election); The Wackenhut Corp., supra note 26, 169 N.L.R.B. 398 (Board declines to direct election on petition of nonqualifying union)
 
 
 [28]
 See Brooks v. NLRB, supra note 24, 348 U.S. at 99, 75 S.Ct. 176; The Wackenhut Corp., supra note 26, 169 N.L.R.B. at 398
 
 
 [29]
 However, it is not inconsistent for the Board to allow an incumbent nonqualifying union to appear on the ballot where a qualifying union has petitioned for an election. See The Wackenhut Corp., supra note 26, 169 N.L.R.B. at 398; cf. Wackenhut Corp., supra note 27, 223 N.L.R.B. No. 17, 91 L.R.R.M. at 1408
 
 
 [30]
 The Regional Director acted in accordance with a long line of cases in which the Board dismissed representation petitions filed by nonqualifying unions on the ground that the petitions did not raise questions of representation. See, e. g., The Wackenhut Corp., supra note 26, 169 N.L.R.B. 398; In re General Motors Co., Inc., 87 N.L.R.B. 371, 374 (1949); In re General Motors Corp., 77 N.L.R.B. 1029 (1948); In re Schenley Distilleries, Inc., 77 N.L.R.B. 468, 470 (1948). The result in this case is not affected by the fact that the Union's petition was filed while petitioner was engaged in recognitional picketing under Section 8(b)(7)(C), which states that when a petition is filed thereunder, "the Board shall forthwith, without regard to the provisions of Section 159(c)(1)," direct an election. We disagree with the view, expressed in Member Fanning's dissent, that Section 8(b)(7)(C) expressly makes irrelevant the petitioning union's certifiability. We think that the quoted language merely provides for an expedited election procedure that dispenses with the usual preelection hearings described in Section 9(c) (1), 29 U.S.C. § 159(c)(1). See International Hod Carriers Bldg. & Common Laborers Union, supra note 20, 135 N.L.R.B. at 1157
 
 
 [31]
 In a similar situation, the Third Circuit in NLRB v. Local 542, Internat'l Union of Operating Eng'rs, 331 F.2d 99 (3d Cir.), cert. denied, 379 U.S. 889, 85 S.Ct. 161, 13 L.Ed.2d 93 (1964), enforced a cease and desist order against a union that had committed an unfair labor practice under Section 8(b) (7)(C). There the union had begun to picket after the employer refused to enter into a prehire agreement. At the time of the picketing, there was "no nucleus of regular operating engineer employees that could have voted in a representational election." Id. at 105. Where the picketing therefore did not look to the holding of an election, the union was held to have violated Section 8(b)(7)(C)
 In Teamsters Local 115 (Vila-Barr Co.), supra note 26, 157 N.L.R.B. 588, the Board distinguished International Union of Operating Engineers. Vila-Barr held that a union seeking to represent a one-man unit did not violate Section 8(b) (7)(C) by picketing for more than 30 days without filing a representation petition. The Board had previously announced a policy of declining to direct elections in one-man units, in view of the agency's inability to certify a bargaining representative in a one-man unit. Al & Dick's Steak House, Inc., 129 N.L.R.B. 1207, 1208 (1961). Accordingly, "through no fault of its own," the union in Vila-Barr was disabled from invoking the Board's election process. 157 N.L.R.B. at 589. In those circumstances, the Board held that it would be inequitable to condition the lawfulness of the union's picketing upon the filing of an inoperative petition. Id. In contrast to the situation in International Union of Operating Engineers, "(t)here is no statutory or other policy against representation of an individual employee in a stable one-man unit by an authorized representative . . .." Id. at 590-91.
 This distinction is equally applicable to the present case, where Section 9(b) (3) evinces a statutory policy against mixed unions of guards and nonguards.
 
 
 [32]
 See Humphrey v. Local 639, supra note 13, 369 F.Supp. at 737; McLeod v. Security Guards and Watchmen, supra note 19, 333 F.Supp. at 771; cf. NLRB v. Local 542, supra note 31, 331 F.2d at 106, 107
 
 
 [1]
 Brink's Inc., 77 N.L.R.B. 1182 (1948); American District Telegraph Co., 89 N.L.R.B. 1228 (1950)
 
 
 [2]
 "We accepted a provision regarding plant guards. We had exempted foremen in the Senate Bill, but we had not exempted guards. The House Bill exempted plant guards, and also time study employees and personnel forces. We did not accept any of those provisions, except that as to plant guards we provided that they could have the protection of the Wagner Act only if they had a union separate and apart from the union of the general employees." (remarks of Sen. Taft), II NLRB, Legislative History of the Labor Management Relations Act, 1947, at 1544 (1948)
 "By the provisions of the House Bill plant guards were completely excluded from the Wagner Act. We compromised with the House by providing that they should have the protection of the Wagner Act, but in a separate unit from the workers in the plants. That is certainly a change although a minor one, nevertheless a reasonable one and certainly it is a compromise with the extreme position taken by the House." (remarks of Sen. Taft), id. at 1572.
 
 
 [3]
 The Board's rationale would even apply to delivery-men:
 The danger of divided loyalty which Congress sought to eliminate may not be quite so far-reaching in the case of armored-car guards, but it is, nevertheless, present. A conflict of loyalty could arise, for example, if the guards should be called upon to deliver money or valuables to one of their customers whose employees were represented by the same union as represented the armored-car guards and the employees of the customer were on strike and picketing the premises of the customer.
 In Armored Motor Service Co., Inc., 106 N.L.R.B. 1139, 1140 (1953).